**OREGON NATURAL DESERT ASSO-CIATION; Oregon Wildlife Federation; Idaho Watersheds Project; and Committee for Idaho's High Desert, Plaintiffs,**

**v.**

**Ed SINGLETON, in his official capacity as Vale District Manager, Bureau of Land Management; Jerry L. Taylor, in his official capacity as Jordan Resource Area Manager, Bureau of Land Management; U.S. Bureau of Land Management, an agency of the United States Department of the Interior; and Bruce Babbitt, in his official capacity as Secretary of the Department of the Interior, Defendants,**

**and**

**Oregon Cattlemen's Association, a non-profit organization on behalf of its members, Intervenor–Defendant.**

**No. Civ. 98–97–RE.**

United States District Court,
D. Oregon.

Nov. 3, 1998.

essary to address the remaining arguments advanced by the government.

**1184**

Jack K. Sterne, Anchorage, Alaska, for plaintiffs.

Kristine Olson, United States Attorney, Thomas C. Lee, Assistant United States Attorney, Portland, Oregon, for defendants.

Jeffrey B. Wilkinson, Stewart Sokol & Gray, LLC, Portland, Oregon, for intervenor-defendant.

## OPINION AND ORDER

REDDEN, Senior District Judge.

The plaintiffs, environmental groups (collectively, "ONDA"), bring this action against the Bureau of Land Management and three named individuals: Ed Singleton and Jerry Taylor, in their official capacities as managers of the Bureau of Land Management, and Bruce Babbitt, Secretary of the United States Department of the Interior (collectively, "BLM.") Oregon Cattlemen's Association appears as an intervenor-defendant.

ONDA challenges the BLM's management plan for the Main, West Little, and North Fork Owyhee Rivers (collectively "Owyhee Rivers"), alleging that the BLM has failed to 1) adopt a management plan which complies with the mandate of the Wild and Scenic Rivers Act ("WSRA"), 16 U.S.C. §§ 1271–1284 to protect and enhance the Owyhee Rivers' values, in that it authorizes continued livestock grazing; 2) prepare an adequate environmental impact statement ("EIS"); and 3) analyze alternative courses of action which would fully protect and enhance the Owyhee Rivers, all in violation of the WSRA, the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370a, and the Administrative Procedures Act, 5 U.S.C. §§ 701–706. ONDA seeks declaratory and injunctive relief, as well as attorney fees and costs under the Equal Access to Justice Act, 28 U.S.C. § 2412.

All parties move for summary judgment (doc. 32, 42, 49). Oral argument on the motions was heard on October 15, 1998.

*Factual Background*

The WSRA states the policy of the United States that certain designated rivers which possess "outstandingly remarkable scenic, recreational, geologic, fish and wildlife, historic, cultural, or other similar values," shall be "preserved in free-flowing condition" and that the rivers and their immediate environments be "protected for the benefit and enjoyment of present and future generations." 16 U.S.C. § 1271. A river is eligible for designation and protection under the WSRA if it is a free-flowing stream and the adjacent land area possesses one or more of the "outstandingly remarkable values" ("ORVs") enumerated in § 1271.

In 1984, Congress designated 120 miles of the Main Owyhee River as a federal wild and scenic river pursuant to the WSRA. In the Oregon Omnibus Wild and

Scenic Rivers Act of 1988, Pub.L. 100–557, *codified at* 16 U.S.C. § 1274(a)(91), Congress added 57 miles of the West Little Owyhee and nine miles of the North Fork Owyhee to the national wild and scenic rivers system. Congress has classified all three segments of the Owyhee Rivers as "wild." A wild river area is defined under the WSRA as "free of impoundments and generally inaccessible except by trail, with watersheds or shorelines essentially primitive and waters unpolluted." 16 U.S.C. § 1273(b). The "wild" classification is the most restrictive of three possible classifications. *Id.* (Each river included in the system must be classified, designated and administered as "wild," "scenic," or "recreational.")

The designated portions of the Owyhee Rivers are in southeast Oregon, along the Oregon–Idaho border. Much of the Owyhee Rivers' length is within steep, rocky walls. The Owyhee canyonlands provide habitat for over 200 species of wildlife. Several plant species within the canyonlands are classified as federal or state sensitive species or are on "watch lists." Redband trout, which have been petitioned for listing under the Endangered Species Act, inhabit the West Little Owyhee River segment of the system.

The river system also contains grazing allotments, under which private cattle and sheep ranchers are given permits to graze their livestock on publicly-owned land, typically at below-market rates. 4 United States Department of Agriculture, *An Assessment of Ecosystem Components in the Interior Columbia Basin and Portions of the Klamath and Great Basins* at 1772, Second Declaration of Jack K. Sterne, Exhibit C.

Section 3 of the WSRA requires the BLM to issue a "comprehensive management plan" to "provide for the protection of the river values" within three fiscal years after designation. 16 U.S.C. § 1274(d)(1). The WSRA requires that the plan "address resource protection, development of lands and facilities, user capacities, and other management practices necessary or desirable to achieve the purposes of this chapter." 16 U.S.C. § 1274(d)(1).

In May 1991, the BLM began the process of preparing an updated management plan for the Owyhee Rivers to comprise the newly-designated sections. The BLM issued a draft management plan and environmental assessment ("EA") analyzing the impact of the Plan and alternatives to it in May 1992, and a final management plan in September 1993 ("the Plan" or "the Plan/EA"). On the basis of the EA, the BLM prepared a finding of no significant impact ("FONSI"), concluding that NEPA did not require preparation of an EIS. The Plan was upheld on appeal to the Interior Board of Land Appeals.

The Plan established that the Main Owyhee contained five ORVs: scenery, geology, recreation, wildlife, and cultural. The ORVs of the West Little and North Fork Owyhee included recreation, scenery and wildlife. The Plan did not designate botanical or fishery ORVs, but characterized vegetation as a "key component of the visual resource, important to watershed values, wildlife habitat, and a vital part of the natural setting for recreation." Administrative Record ("AR") Tab 178, p. 24.

The management standard for livestock grazing articulated in the Plan is as follows: "Agricultural use is restricted to a limited amount of domestic livestock grazing and hay production to the extent currently being practiced." AR Tab 178 p. 13.

*Plan's findings on impact of grazing on Owyhee Rivers*

At the time of planning, the BLM recognized that in the river area accessible to livestock—67 miles, or 36%, of the 186-mile river system—grazing was creating noticeable negative effects on about 10%, or 18 miles. AR Tab 178, p. 16. The areas most affected by livestock grazing were trail crossings and "water gaps," the places livestock came to the river to drink.

The EA noted that at least seven of 11 grazing allotments and one trail area showed negative effects from livestock grazing, and that these negative effects had a direct impact on the scenic, recreational, and watershed ORVs of the Owyhee Rivers. AR Tab 178, p. 86–87. The seven affected allotments were Quartz Mountain, Bogus Creek, West Cow Creek, Saddle Butte, Jackies Butte, Louse Canyon, and Campbell. *Id.*

The EA also contained a finding that there had been livestock use ranging from heavy to slight at 56 of the 138 campsites in the river corridor, AR Tab 178, p. 89, and that livestock use at 12 of these camp-sites—those situated at water gaps or trailing points along the corridor—was "generally heavy." *Id.*

The Plan had also noted this grazing damage in its statement of issues:

> At certain locations along each river segment, grazing is suspected of causing impacts to the [ORVs] identified in each river's designations. Areas of concern include Five Bar, Three Forks Deary Pasture, Sand Hollow, Fletcher Trail, Granite Creek, Sand Spring to Bull Creek, the Hole–in–the–Ground, Greeley Bar, Island Field, Squaw Creek ... Anderson Crossing, and the upper reaches of the West Little Owyhee River.

AR Tab 178, p. 16. The negative impact of livestock grazing on ORVs was described as follows:

- conflicts with recreationists where live-stock congregate, graze and deficate [sic] on and around campsites;
- visual impacts of livestock trailing and grazing affecting scenic and recreation values;
- ecological condition (status) of upland and riparian areas currently in early to mid seral status that have been or are heavily impacted by livestock grazing, trampling or defecation.

AR Tab 178, p. 16. The Plan also noted that

> [s]everal areas along the river corridors have been livestock gathering routes and trailing routes for many years. Some of these areas (Five Bar, Three Forks, Fletcher Trails, Granite Creek, Sand Springs, Navaro, Ryegrass, and Bull Creek) are receiving significant impacts. Vegetation is denuded on the immediate area of trails and where livestock are gathered and concentrated for short periods of time while moving between pastures or allotments. The scenic and aesthetic quality of these areas are [sic] diminished as a result of livestock grazing, trampling, and defecation. Since many of these sites are also used for camping, recreation experience is negatively impacted. In addition, cultural sites are degraded from cattle concentrated on sites. Livestock milling breaks artifacts, compacts the ground surface and mixes the artifacts, breaks down river banks, and promotes erosion that can wash away parts of sites.

*Id.* Other parts of the administrative record also reflect concerns about livestock grazing at the time the Plan was being written. In a memorandum written in 1992 to the Jordan Resource Area Manager, BLM's Supervisory Range Conservationist, Thomas G. Miller, noted that campsites at water gaps were "hammered" by livestock, AR Tab 176, p. 1046, but recommended only that recreationists be told in advance of these conditions so they would not "see cow dung everywhere ... [and] be pissed." *Id.*

The administrative record also shows that the holders of cattle grazing permits resisted suggestions from the BLM that their allotments be modified to protect the river area. For example, Miller had a meeting on November 4, 1992, with some permit holders to discuss BLM recommendations for the area from Bull Creek to Rome. AR Tab 176, p. 1043. Miller told the group the BLM wanted to eliminate the impact of grazing at Ryegrass, an area of "major concern," because it included a large campsite with a hot spring. The allotment holders insisted that closing Ryegrass as a water gap was unacceptable

because it would make a large part of their allotment "economically valueless." AR Tab 176, p. 1044. (Ryegrass was not closed, and five years later, it remained an "area of livestock concern" to the BLM. Declaration of Jeff Wilbanks, 1997 Areas of Livestock Concern.)

At the November 1992 meeting, Miller also raised the issue of Sand Springs, another "major concern" for the BLM, and asked the permit holders whether "there was any way" to close it down. AR Tab 176, p. 1044. The permit holders argued that Sand Springs was also a critical water gap, and that closing it to grazing would make their allotments economically worthless. (Sand Springs was not closed, and five years later it too remained an "area of livestock concern." Declaration of Jeff Wilbanks, 1997 Areas of Livestock Concern.)

The permit holders took the same position with respect to the Bull Creek and Fletcher Trails water gaps. AR Tab 176, p. 1044. They also refused to assume any financial responsibility for exclusionary fencing or hauling water, both proposed as possible methods of minimizing the impact on the water gaps. Miller did not regard well drilling as a feasible method of providing alternate sources of water, because the area was a "well known failure area for well drilling," and even "if we do hit water it will be very deep." *Id.*

Miller's memorandum on that meeting concludes:

> Throughout the meeting it was stated that *there was no way the water gap situation* at Bull Creek, Rye Grass, Tim's private, Sand Springs, So. of Sand Springs and Fletcher Trails *could be managed for less impacts.* They [the permit holders] stated that *a water gap is going to get hammered no matter what and you can't have utilization criteria at a water gap.*

*Id.* p. 1045 (emphasis added).

Miller held another meeting on November 9, 1992 with the Jackies Butte grazing operators. AR Tab 176, p. 1041. The purpose of the meeting was, again, to dis-

cuss the BLM's recommendations for solving grazing conflicts in two areas of concern, Sand Hollow and Deary Pasture. Miller noted that the BLM told the operators "we would like to eliminate our dependence on these two areas by providing water on top of the rim." *Id.* Miller asked whether the operators would accept the BLM's developing permanent water (reservoirs or wells) in the two areas. *Id.* The operators opposed exclusionary fencing until the BLM made a permanent water source available; they refused to take financial or maintenance responsibility for wells; and if the wells failed, they insisted on immediate access to the river or an immediate fix by the BLM. *Id.,* p. 1041–42. The operators proposed that BLM build a seven-mile pipeline at public expense into Deary Pasture, but the BLM disagreed. Miller concluded,

> I do not believe they [the operators] are willing at this time to agree to us providing water above the rim and they [sic] maintaining it.... They feel that they have no costs now regarding using the river so why should they incur more costs? They feel strongly this is the first step in the process of taking away their grazing rights and they won't stand for it.... I'm pretty sure we won't reach agreement in time for the final river plan.

*Id.,* p. 1042.

*BLM's objectives for range management*

Section 1281(a) of the WSRA specifies the management duties of the federal agency charged with managing the designated river:

> Each component of the national wild and scenic rivers system shall be administered in such manner as to protect and enhance the values which caused it to be included in said system without, insofar as is consistent therewith, limiting other uses that do not substantially interfere with public use and enjoyment of these values. In such administration primary emphasis shall be given to protecting its

esthetic, scenic, historic, archaeologic, and scientific features. Management plans for any such component may establish varying degrees of intensity for its protection and development, based on the special attributes of the area.

16 U.S.C. § 1281(a).

The Plan promulgated by the BLM specified the following objectives for range management:

> Maintain or improve the vegetative cover of key species and the visual aspect of native perennial plants, within the soil and vegetative capabilities of ecological sites, in the corridor by 1999. Maintain proper utilization of key species. Minimize livestock impacts on vegetation and soils, within the river corridor, at water gaps/trail crossings, on uplands, and in riparian areas. Minimize livestock/recreation conflicts at water gaps/trail crossings by 1999.

AR Tab 178, p. 30. The Plan's first management prescription for grazing was to "[i]nventory the river corridors to determine riparian areas and potentials." The inventory was necessary because the BLM did not at the time the Plan was written have baseline data on the level of grazing that had occurred at the time the rivers were designated or that was occurring at the time the Plan was being written. See letter from Jerry Taylor dated February 1, 1993, AR Tab 219, p. 1681 (noting absence of data on grazing at time of designating and observing that during the drought years, 1987–94, grazing was in excess of that before designation).

To achieve its goal of "maintaining or improving" vegetation, the Plan established three utilization standards: livestock could not consume more than 40% of the annual growth of "key grass species" in upland areas except for certain winter allotments, which were allowed 50% consumption, and livestock could not consume more than 30% of the annual growth of "current years leaders" for willows in riparian areas. AR Tab 178, p. 31, 61. However, at the time the standards were set, the BLM had no utilization studies for riparian areas. *Id.* It appears from the Plan and other parts of the administrative record that the 30, 40 and 50% utilization standards represented the grazing levels in existence at the time the Plan was being written. AR Tab 178, p. 13 ("Agricultural use is restricted to a limited amount of domestic livestock grazing ... *to the extent currently being practiced.*"); *see also* letter dated March 18, 1994 from James May, Vale District Manager, to Aron Yarmo, Attorney at Law, AR Tab 223, p. 1878 ("The final plan ... recommends management actions ... [which] *do not substantially change the existing direction for livestock management within the corridor.*") (Emphasis added).

> The Plan further provided that
>
> [h]erbaceous riparian vegetation will be managed to insure a properly functioning riparian system. Management may include restrictions on use levels, seasons or where feasible and compatible exclusionary fencing. Key sites will be monitored and use levels and/or management may be revised, on a case by case basis, through the allotment evaluation process. Any changes in use levels and or management must ensure plan objectives are being met. Water gaps and trail crossings will be managed so that vegetative cover does not decrease and, if possible, increases. Alternate sources of water, fencing and improved herding practices will be utilized where possible to reduce or eliminate livestock impacts at water gaps and trail crossings. Primary focus will be given to areas where camping/livestock conflicts exist.

AR Tab 178, p. 31.

*Grazing impacts since promulgation of the Plan*

In January 1995, the BLM sent a letter to the holders of a grazing permit for Deary Pasture, notifying them that the BLM was closing Deary Pasture to grazing for two years. Sterne Declaration, Exhibit A, p. 54–57. The letter noted that

since a grazing issue had "surfaced in August 1994," *id.,* p. 54, the BLM had "several contacts" with the permit holders to "try to identify reasonable solutions to the problem." *Id.* However, according to the letter, the BLM and the permit holders had been "unable to agree on even short term measures for the immediate protection of the many resource values found within the area known as the Deary Pasture."

The letter acknowledged that the drought of 1987–94 had caused more concentrated grazing of the Deary Pasture area in 1989, 1990, 1992, 1993, and 1994 (severe drought conditions caused closure of the entire Jackies Butte allotment, including Deary Pasture, in the spring and summer of 1991). As a result of the heavy grazing,

> [r]iparian and upland vegetation has been overutilized, resulting in the system being left more susceptible to erosion during spring runoff events. Recreational, scenic and aesthetic values have been diminished by the impacts of livestock grazing along the river and in the surrounding areas that are accessible to livestock. Impact to these areas include excessive utilization of vegetation, trail proliferation, trampling, and degradation of campsites. The character of the Deary Pasture, particularly of those portions in the bottom of the canyon and adjacent to the river, has changed from that which existed at the time the river was designated a Wild and Scenic river. The full understanding of this fact and the implications it presents from a management standpoint have just recently been fully realized by the BLM.

*Id.* at p. 55. The letter went on to say that the "heavy to severe grazing of 1994 had a negative affect [sic] on the naturalness of the area as a result of the 'cropped' and trampled appearance of vegetation, the increased concentration of livestock manure, and the increase in soil disturbance as a result of very evident livestock trails." *Id.* at p. 56. The letter recorded that standing vegetative litter and woody growth had

been "reduced significantly by the increased frequency of grazing and overgrazing, leaving basic soil sources more susceptible to water erosion," *id.,* and "reduced the capability of existing riparian vegetation" to reduce the velocity of runoff and filter out sediments. *Id.*

A comparison of two maps put out by the BLM in 1993 and 1997 shows improvement in four out of 12 "areas of livestock concern:" Greeley Bar, Bull Creek, Deary Pasture and Three Forks. Declaration of Jeff Wilbanks, WS & R Plan 1993 Areas of Livestock Concern and WS & R Plan 1997 Areas of Livestock Concern. The elimination in 1997 of Deary Pasture and Three Forks as "areas of concern" appears to be the result of the complete elimination in 1995 of grazing in Deary Pasture, a five-mile stretch of the river, as does the improvement in three of the 12 campsites identified in the Plan as having sustained heavy impacts from cattle.

The BLM recently documented the attainment of Properly Functioning Condition of Riparian Areas on 146.5 miles of the river areas (93%), with 6.8 miles (4.4%) functioning at risk. However, the record does not disclose how this recent assessment relates to the 18 miles identified at the time of the Plan as having been negatively affected by grazing and the five miles of river in Deary Pasture where grazing has been eliminated.

According to the BLM, "properly functioning riparian condition" means that adequate vegetation, landform, or large woody debris is present to:

1) dissipate stream energy associated with high waterflows, thereby reducing erosion and improving water quality;

2) filter sediment, capture bedload, and aid floodplain development;

3) improve flood-water retention and ground-water recharge;

4) develop root masses that stabilize streambanks against cutting action;

5) develop diverse ponding and channel characteristics to provide the habitat

and the water depth, duration, and temperature necessary for fish production, waterfowl breeding, and other uses; and

6) support greater biodiversity.

Defendants' Exhibit 105, p. 3. The evidence does not reveal how "properly functioning riparian areas" or "at risk" areas correspond to the requirements of the WSRA.

## Standard of Review

■■■ The court's review of a final agency action is governed by the standard articulated in section 10(e) of the APA, 5 U.S.C. § 706(2)(A); *In re Transcon Lines*, 89 F.3d 559, 563 (9th Cir.1996). Section 10(e) provides that the reviewing court shall "hold unlawful and set aside agency action ... found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Deference is given to the agency with a presumption that the agency's decisions are valid. *EPA v. National Crushed Stone Ass'n*, 449 U.S. 64, 83, 101 S.Ct. 295, 66 L.Ed.2d 268 (1980). The court may not substitute its judgment for that of the agency. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

■■ An agency acts arbitrarily and capriciously if it has

1) relied on factors which Congress has not intended it to consider; 2) entirely failed to consider an important aspect of the problem; 3) offered an explanation for its decision that runs counter to the evidence before the agency; or 4) is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Southwest Center for Biological Diversity v. U.S. Forest Service*, 100 F.3d 1443, 1448 (9th Cir.1996), *citing Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). The court determines the importance of a problem by determining what the statute in question makes important. *Lake Mohave Boat Owners Ass'n v.*

*National Park Service*, 138 F.3d 759, 763 (9th Cir.1998). Thus, the reviewing court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh v. Oregon Nat'l Resources Council*, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). The court's inquiry must be "searching and careful," but "the ultimate standard of review is a narrow one." *Id.*

The "arbitrary and capricious" standard of review is not markedly different from the "reasonableness" standard adopted by the Ninth Circuit before *Marsh* was decided. *See Marsh*, 490 U.S. at 377 n. 23, 109 S.Ct. 1851 (difference between two standards is "not of great pragmatic consequence" and does not require a "substantial reworking of long-established NEPA law.")

## Legal Standards

### Summary judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

### NEPA's EIS requirements

■■ NEPA requires that for all "major Federal actions significantly affecting the quality of the human environment," federal agencies prepare an EIS analyzing the environmental impact of the proposed action and alternatives to the action. 42 U.S.C. § 4332(2)(C). A plaintiff seeking an EIS need not show that significant effects will in fact occur; if the plaintiff raises substantial questions about whether a project may have a significant effect, an EIS must be prepared. *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1332 (9th Cir.1992). Thus, the threshold for requiring preparation of an EIS is "relatively low." *Save the Yaak Committee v. Block*, 840 F.2d 714, 717 (9th Cir.1988).

■ An agency's decision not to prepare an EIS will be considered unreasonable if the agency fails to supply a convincing statement of reasons why potential effects are insignificant. *Save the Yaak*, 840 F.2d at 717; *The Steamboaters v. FERC*, 759 F.2d 1382, 1393 (9th Cir.1985). The statement of reasons is crucial to the determination of whether the agency took the required "hard look" at the potential environmental impacts of a proposed project. *Save the Yaak*, 840 F.2d at 717; *see also Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976).

■ The court must defer to an agency's decision not to prepare an EIS only when the decision was "fully informed and well considered." *LaFlamme v. FERC*, 852 F.2d 389, 398 (9th Cir.1988); *Jones v. Gordon*, 792 F.2d 821, 828 (9th Cir.1986).

### Discussion

*Has the BLM complied with the requirements of the WSRA?*

■ ONDA contends the BLM has violated the WSRA in that it has authorized livestock grazing without first finding that such grazing is compatible with the protection and enhancement of the Owyhee Rivers' ORVs. The court agrees.

ONDA points out that BLM's statutory mandate is to administer the river area primarily to "protect and enhance" its ORVs. 16 U.S.C. § 1281(a); *Oregon Natural Desert Ass'n v. Green*, 953 F.Supp. 1133 (D.Or.1997). ONDA asserts that the BLM has failed to do this because although the continued grazing demonstrably created negative impacts on the rivers' ORVs incompatible with the statutory mandate to protect and enhance them, the BLM has apparently never considered itself authorized to eliminate, rather than regulate, cattle grazing.

The BLM and the intervenor argue that cattle grazing was permitted on the Owyhee Rivers at the time they were designated, and thus that cattle grazing is necessarily compatible with the ORVs recognized in the Owyhee Rivers when they were designated. The BLM proffers the 1979 National Park Service Environmental Statement ("the 1979 ES"), the report on which Congress relied to designate the Main Owyhee River. The 1979 ES said, "Livestock grazing ... would be continued under license from the BLM on all Federal land but moderated as necessary so as not to be detrimental to soil stability, vegetative patterns, wildlife distribution, water quality, or other environmental values."

The BLM and the intervenor argue that the 1979 ES proves that when the Owyhee was designated as a wild and scenic river, Congress 1) recognized that grazing was consistent with the Owyhee's incorporation into the national system; and 2) intended for it to continue, subject to management as necessary to protect river values. *See* BLM's Memorandum in Support of Motion, p, 9. The BLM interprets this to mean that it has the authority to *restrict* cattle grazing as necessary to protect river values, but that it cannot *eliminate* grazing altogether.

The court is not persuaded by this argument. The language of the WSRA itself is unambiguous and gives no support to the notion that Congress specifically intended cattle grazing to occur in the Owyhee Rivers. As the court pointed out in *ONDA v. Green*, 953 F.Supp. 1133 (D.Or.1997), despite the fact that grazing had been permitted on the Donner und Blitzen River before it was designated as a wild river system, the BLM nevertheless had authority to exclude cattle from the river area if necessary to protect and enhance the river's values. In *ONDA v. Green*, the court also noted that Congress "is cognizant of its ability to grandfather specific commercial uses of a wild and scenic river that might otherwise be prohibited by the WSRA," and took note of the fact that Congress had not chosen to do so in that instance. Nor, of course, has it chosen to do so here.

■ When the terms of a statute are unambiguous, judicial inquiry is complete except in rare and exceptional circum-

stances. *Demarest v. Manspeaker,* 498 U.S. 184, 190, 111 S.Ct. 599, 112 L.Ed.2d 608 (1991). Thus, even though a statute's "[l]egislative history can be a legitimate guide to a statutory purpose obscured by ambiguity, . . . in the absence of a clearly expressed legislative intention to the contrary, the language of the statute itself must ordinarily be regarded as conclusive." *Burlington Northern R. Co. v. Oklahoma Tax Comm'n,* 481 U.S. 454, 461, 107 S.Ct. 1855, 95 L.Ed.2d 404 (1987) (citations and internal quotations omitted); *City of Auburn v. United States Government,* 154 F.3d 1025, 1029 (9th Cir.1998). Where the statutory command is straightforward, there is no reason to resort to legislative history. *City of Auburn,* 154 F.3d at 1030, *quoting United States v. Gonzales,* 520 U.S. 1, 117 S.Ct. 1032, 1035, 137 L.Ed.2d 132 (1997).

Accordingly, to the extent that the 1979 ES appears to assume that grazing will continue, that assumption is overridden by the explicit "protect and enhance" language of the WSRA and the designation of the Owyhee Rivers as "wild," which under the terms of the statute requires that watersheds be maintained in a primitive condition and the waters kept unpolluted. Regardless of whether cattle grazing was a permitted use when the rivers were first designated, if grazing proves to be detrimental to soil, vegetation, wildlife, or other values, or is inconsistent with the "wild" designation, then clearly the BLM has the right—indeed, the duty—not only to restrict it, but to eliminate it entirely.

The BLM and the intervenor also contend that the burden of proof is on ONDA to show that livestock use of the Owyhee Rivers constitutes a "substantial likelihood" of "substantial degradation" to ORVs in order to establish an actionable violation of the WSRA. Again, the court disagrees.

The WSRA provides that each component of the national wild and scenic rivers system is to be administered in such a manner as to "protect and enhance" its ORVs, "without, *insofar as is consistent*

*therewith,* limiting other uses that do not substantially interfere with public use and enjoyment of these values." 16 U.S.C. § 1281(a) (emphasis added). The court notes that the intervenor tends to quote this language with an ellipsis for the italicized phrase, (*see, e.g.,* intervenor's Memorandum in Opposition to Plaintiffs' Motion, p. 22, 23, intervenor's Reply, p. 2, 3) but the italicized phrase clearly gives primacy to "protect and enhance," and not to "other uses."

The court interprets this provision to mean that ORVs are to be protected and enhanced, and that uses which are *consistent with* such protection and enhancement *and* do not substantially interfere with public use and enjoyment of the river ORVs, should not be limited. In particular, the use of the word "enhance" in the primary admonition to "protect and enhance" cannot reasonably be interpreted to permit any use so long as it does not "substantially degrade" the river system's values. Accordingly, the court rejects the intervenor's argument that because cattle grazing was occurring on the rivers at the time of designation, the WSRA implicitly favors its continuation.

The court concludes that the WSRA gives the BLM authority to eliminate cattle grazing, or any other commercial use, if doing so is consistent with the mandate to protect and enhance the river values. There is no presumption in favor of cattle grazing which plaintiffs must overcome with a showing of "substantial degradation."

The BLM asserts that it is plaintiffs' burden to show that the Plan "currently allows impacts in violation of the WSRA." Reply Memorandum, p. 5. This argument would have merit but for the fact that such a burden on the plaintiffs is obviated by the BLM's own findings of impacts in violation of the WSRA. In the EA, the BLM stated that ORVs in 11 allotments, one trail area, and 12 campsites were negatively affected by livestock grazing. Several years later, the situation was little different. Almost the only improvement was

the Deary Pasture and Three Forks area, which had been quite degraded in January 1995, and did not improve until grazing was halted.

*Did the BLM violate NEPA by failing to prepare an EIS?*

The BLM did not prepare an EIS when it promulgated the Plan; instead, it prepared an EA and a FONSI. ONDA asserts that because the Plan for the Owyhee Rivers included cattle grazing, which had a significant impact on the environment, the BLM should have prepared an EIS rather than an EA. The BLM argues that because the Plan mitigated grazing to avoid significant impacts, an EIS was unnecessary and the FONSI was correct.

Under the regulations implementing NEPA, agencies have three choices for complying with 42 U.S.C. § 4332(2)(C): 1) a "categorical exclusion" for certain proposed actions, 40 C.F.R. §§ 1508.4, 1501.4(a)(2); 2) an EA followed by a FONSI for those proposed actions not significantly affecting the quality of the human environment, 40 C.F.R. §§ 1508.9, 1501.4(b), (c), and (e); and 3) an EIS when neither of the first two options is used. 40 C.F.R. §§ 1508.11, 1501.4.

An EA must "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9(a). The information presented in the EA must be of "high quality," and include "accurate scientific analysis." 40 C.F.R. 1500.1(b). The agency must adequately explain its decision not to prepare an EIS by supplying a "convincing statement of reasons why potential effects are insignificant." *The Steamboaters,* 759 F.2d at 1393. The statement of reasons is crucial to determining whether the agency took a hard look at the potential environmental impacts of the project. *Id. See also Marsh,* 490 U.S. at 374, 109 S.Ct. 1851 (NEPA requires that agencies "take a 'hard look' at the environmental effects of their planned action, even after a proposal has received initial approval").

As the BLM correctly points out, the "mitigated FONSI" is upheld when the mitigation measures significantly compensate for a proposed action's adverse environmental impacts. *Friends of Endangered Species, Inc. v. Jantzen,* 760 F.2d 976, 987 (9th Cir.1985); *Greenpeace Action,* 14 F.3d at 1332–33. *See also City of Auburn,* 154 F.3d at 1033 (agency may condition its decision not to prepare a full EIS on adoption of mitigation measures). However, although mitigation measures need not completely compensate for adverse environmental impacts, *Friends of the Payette v. Horseshoe Bend Hydroelectric Co.,* 988 F.2d 989, 993 (9th Cir.1993), the agency must analyze mitigation measures in detail and explain how effective the measures would be. *Northwest Indian Cemetery Protective Ass'n v. Peterson,* 795 F.2d 688, 697 (9th Cir.1986), *rev'd on other grounds, Lyng v. Northwest Indian Cemetery Protective Ass'n,* 485 U.S. 439, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988). "A mere listing of mitigation measures is insufficient to qualify as the reasoned discussion required by NEPA." *Id.* Instead, mitigation measures should be supported by analytical data, *Idaho Sporting Congress v. Thomas,* 137 F.3d 1146, 1151 (9th Cir. 1998), even if that data is not based on the best scientific methodology available. *Greenpeace Action,* 14 F.3d at 1333.

The Plan/EA itself shows that when the BLM made the FONSI, it knew grazing had negatively affected specific sites. However, it had no baseline data on the quality or quantity of vegetation at the affected sites or elsewhere, either for the time of designation or for the drought after designation, which saw more concentrated grazing. The BLM's awareness of its lack of data is demonstrated by the Plan's prescription of an inventory "to determine riparian areas and potentials."

The evidence also shows that at the time the FONSI was made, the BLM had no utilization studies for riparian areas. AR Tab 178, p. 31. So, although the Plan/EA proposed to mitigate grazing

with utilization standards of 30, 40 and 50%, these standards were not correlated to existing conditions, because existing conditions were unknown at the time. The standards were not correlated to any utilization studies because the BLM had none. The utilization standards are generally applicable to all upland and riparian areas, rather than site-specific; thus, there is no indication that the utilization standards were intended to remedy negative effects in the degraded areas, rather than merely maintain the status quo. The evidence indicates that the utilization standards represented nothing more than the grazing levels in existence at the time the Plan was promulgated. *See* AR Tab 178, p. 13 ("Agricultural use is restricted to a limited amount of domestic livestock grazing ... to the extent currently being practiced.") and AR Tab 223, p. 1878 ("The final plan ... recommends management actions ... [which] do not substantially change the existing direction for livestock management within the corridor."). The utilization standards, then, are not only unsupported by data, but also cannot accurately be described as mitigation, since they apparently represent a continuation of current grazing practices—the same conditions identified in the Plan/EA as having produced negative impacts in some areas.

The only other specific mitigation measures set out in the Plan/EA to compensate for the identified negative impacts of cattle grazing are limits on trailing and seasonal restrictions. But these measures are also unsupported by analytical data, and there is no evidence that they represent a departure from practices in existence at the time the Plan was written. Otherwise, the Plan/EA merely sets out optimistic expectations, contingent plans, and anticipated outcomes.

The court concludes that the BLM's "mitigated FONSI" is insufficient to avoid an EIS. The Plan/EA itself identifies specific areas in which cattle grazing is negatively affecting the rivers' ORVs. The BLM's "mitigated FONSI" is not supported by any analytical data; its mitiga-

tion measures are not specific to degraded areas and appear to be nothing more than a continuation of the status quo; and it does not reveal how mitigation measures would compensate for the adverse environmental impacts identified in the Plan/EA. There is no evidence in the record that if the utilization standards are something different from the status quo, they are anything more than guesswork, given the absence of an inventory and utilization studies.

The court notes that the Plan/EA contains no statistical data and not a single scientific citation. It is replete with plans to monitor conditions and develop data in the future, but as plaintiffs point out, NEPA requires "that the agency develop the data first, and then make a decision, not make a decision and then develop the data." Plaintiffs' Memorandum in Support, p. 20. *See also Foundation for North American Wild Sheep v. U.S. Dep't of Agriculture,* 681 F.2d 1172, 1179 (9th Cir.1982) ("the very purpose of NEPA's requirement that an EIS be prepared for all actions that may significantly affect the environment is to obviate the need for ... speculation by insuring that available data is gathered and analyzed *prior to the implementation of* the proposed action.") (Emphasis added).

The EA falls well short of "accurate scientific analysis" and of supplying a "convincing statement of reasons" why continued grazing on the river corridor—recognized in the Plan as having a negative effect on the rivers' ORVs—could have an insignificant impact.

*Consideration of alternatives*

NEPA directs federal agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E). The NEPA regulations promulgated by the CEQ, which are binding on federal agencies, require the agency to consider a reasonable range of alternatives, including a "no action" alternative.

See *Prairie Wood Products v. Glickman*, 971 F.Supp. 457, 471 (D.Or.1997). The agency need not consider alternatives that are not feasible, ineffective, or inconsistent with the basic policy objectives for the management area. *Id.* However, alternatives must "[r]igorously explore and objectively evaluate *all* reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss reasons for their having been eliminated." 40 C.F.R. § 1502.14(a) (emphasis added). The requirement of considering a reasonable range of alternatives applies to an EA as well as an EIS. 40 C.F.R. § 1508.9(b).

▮ The plaintiffs contend that the BLM failed to consider realistic alternatives to its decision to continue grazing. The court agrees.

The Plan/EA analyzes three alternatives. Alternative A, the preferred alternative and the basis of the Plan, articulates an intention to provide a "balanced approach to protecting and enhancing the outstandingly remarkable values (ORVs) of each river." AR Tab 178, p. 56. Alternative B is a "no action" alternative which would continue current management practices, without inventory, without adjustment for drought or other conditions, without monitoring, and with grazing controls only in "those instances where it is advantageous to the management of livestock, beneficial to resource objectives, and does not conflict with existing laws and regulations." *Id.,* p. 61–62. Alternative C, an "emphasize recreation alternative," would exclude livestock from the river corridors by means of fencing, water developments or grazing systems, but would also develop new recreation facilities and roads, leading to increased visitor use; the BLM found this alternative would have a negative effect on vegetation within the river corridors. *Id.*

The court finds that Alternative C is plainly incompatible with protecting river values other than recreation and with maintaining the river in a primitive state: although it involves the complete removal of cattle, it also calls for leasing surrounding properties to a concessioner for management, developing sites for high general public use, constructing cabins and a museum, building hiking trails, constructing developed recreation sites with trash barrels and toilet facilities, building roads, and creating access areas. The BLM admitted in the Plan/EA that this alternative would have a negative effect on vegetation within river corridors.

Noticeably absent from the EA is an alternative which simply eliminates cattle grazing, without compromising the rivers' scenic, geologic, wildlife and cultural values. The EA contains no explanation of why this alternative was not considered: certainly it is an obvious "reasonable alternative."

Apart from failure to consider an obvious reasonable alternative, analysis of Alternatives B and C convinces the court that the BLM avoided the necessity of taking a "hard look" at grazing in its preferred alternative by setting up two straw men for comparison: alternatives completely at odds with the WSRA's policy objectives of protecting and enhancing the river values and maintaining the river in a manner consistent with its designation as "wild."

*Conclusion*

The court concludes that the BLM has violated the WSRA by adopting a management plan which fails to consider whether cattle grazing is consistent with the rivers' ORVs. It has therefore "failed to consider an important aspect" of river management which implicates the policy objectives of the WSRA. The BLM apparently has done so in the mistaken belief that it has no authority to eliminate—rather than regulate—cattle grazing within the river area.

The BLM's "mitigated FONSI" is insufficient to avoid preparation of an EIS. The Plan/EA unequivocally identifies several areas within the river area which have been negatively affected by cattle grazing. The mitigation measures set out in the Plan/EA are not supported by any scientific data or analysis and do not address the specific problems identified in the Plan/

1196

EA. Thus, there is no evidence to support the BLM's assumption that the mitigation measures would significantly compensate for the adverse environmental impacts identified in the Plan/EA. The range of alternatives considered in the Plan/EA were unreasonable and inconsistent with the BLM's mandate under the WSRA and under NEPA. The BLM is therefore ordered to prepare an EIS which includes consideration of reasonable alternatives to its proposed action. Because the court has deferred consideration of plaintiffs' request for injunctive relief, plaintiffs' motion for summary judgment (doc. # 32) is granted in part and denied in part. Defendants' motion for summary judgment (doc. # 49) is denied. Intervenor's motion for summary judgment (doc. # 42) is denied.

IT IS SO ORDERED.