**SISKIYOU REGIONAL EDUCATION PROJECT, Plaintiff,**

v.

**Nancy ROSE, District Ranger, Galice Ranger District; Michael Lunn, Supervisor, Siskiyou National Forest; United States Forest Service; Daniel Glickman, Secretary, United States Department of Agriculture, Defendants.**

No. Civ. 98–3069–CO.

United States District Court,
D. Oregon.

Dec. 13, 1999.

Elizabeth Mitchell, Western Environmental Law Center, Eugene, OR, for Siskiyou Regional Education Project, plaintiff.

Edward A Boling, U.S. Department of Justice, Environment & Natural Resources Division, Washington, DC, for Nancy Rose, District Ranger, Galice Ranger District, defendant.

Edward A Boling, U.S. Department of Justice, Environment & Natural Resources Division, Washington, DC, for Michael Lunn, Supervisor, Siskiyou National Forest, defendant.

Edward A Boling, U.S. Department of Justice, Environment & Natural Resources Division, Washington, DC, for United States Forest Service, defendant.

Edward A Boling, U.S. Department of Justice, Environment & Natural Resources Division, Washington, DC, for Daniel Glickman, Secretary, United States Department of Agriculture, defendant.

## ORDER

HOGAN, District Judge.

■ Magistrate Judge John P. Cooney filed Findings and Recommendation on June 24, 1999, recommending that this court grant in part and deny in part defendant's motion for summary judgment (# 22), and grant in part and deny in part plaintiffs' motion for partial summary judgment (# 25). The matter is now before me pursuant to 28 U.S.C. § 636(b)(1)(B) and Fed.R.Civ.P. 72(b). When either party objects to any portion of a magistrate judge's Findings and Recommendation, the district court must make a *de novo* determination of that portion of the magistrate judge's report. *See* 28 U.S.C. § 636(b)(1); *McDonnell Douglas Corp. v. Commodore Business Machines, Inc.*, 656 F.2d 1309, 1313 (9th Cir.1981), *cert. denied*, 455 U.S. 920, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982). Defendants have timely filed objections to twenty-nine findings of the magistrate judge. I have, therefore, given *de novo* review of Magistrate Judge Cooney's rulings.

Based on this *de novo* review, I adopt Magistrate Judge Cooney's findings and recommendation in their entirety. Accordingly, defendants' motion for summary judgment (# 22) is granted in part and denied in part, and plaintiff's motion for partial summary judgment (# 25) is granted in part and denied in part, as specified in Magistrate Judge Cooney's Findings and Recommendation dated June 24, 1999.

## FINDINGS AND RECOMMENDATION

COONEY, United States Magistrate Judge.

Plaintiff Siskiyou Regional Education Project brings this action alleging that defendants Nancy Rose, District Ranger of the Galice Ranger District, Michael Lunn, Supervisor of the Siskiyou National Forest, the United States Forest Service (USFS), and Daniel Glickman, Secretary of the United States Department of Agriculture (hereinafter collectively referred to as defendants) violated the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*, the National Forest Management Act (NFMA), 16 U.S.C. § 1604 *et seq.*, the Forest Service Administration Act of 1897 (Organic Act), 16 U.S.C. § 473 *et seq.*, the Administrative Procedures Act (APA), 5 U.S.C. § 701 *et seq.*, and their implementing regulations. Plaintiff alleges that defendants violated NEPA when they amended the Siskiyou National Forest Land Resource Management Plan (LRMP) based on an inadequate analysis of foreseeable and cumulative environmental impacts, and when they authorized suction dredge mining operations to proceed without analyzing the individual or cumulative impacts of the operations on sensitive fish populations, fish habitat, and water quality in Silver Creek. Plaintiff alleges that defendants violated the NFMA's Standards and Guidelines by allowing mining operations to proceed within a Supplemental Resource Area (SRA) without approved plans of operation. Plaintiff also alleges defendants violated the Forest Service's Organic Act, when they failed to minimize the adverse impacts of the suction dredge mining operations on forest resources. Plaintiff seeks an order enjoining the Forest Service from authorizing suction dredge operations in the Siskiyou National Forest, unless and until the agency complies with NEPA, NFMA, the Organic Act, and the APA. Before the court are defendants' motion for summary judgment (# 22) and plaintiff's motion for partial summary judgment (# 25).

## I. FACTS[1]

The LRMP for the Siskiyou National Forest was issued in 1989. (AR–1 Siskiyou National Forest LRMP). Two categories of Standards and Guidelines are applied to the management of the Siskiyou National Forest: 1) forest-wide Standards and Guidelines, which apply to all Management Areas unless specifically excepted, and 2) Standards and Guidelines which are specific to particular Management Areas on the forest. (Id. at IV–20). The Siskiyou National Forest has fourteen Management Areas, "each with different management goals, resource potential and limitations." (Id. at IV–65).

One of the Management Areas included in the Siskiyou National Forest LRMP is the Supplemental Resource Area (SRA). (Id. at IV–101). SRAs are described as "areas of the Forest which are considered highly productive or critical habitats for wildlife and fish; are critical for the maintenance of watershed condition; or have special recreation values." (Siskiyou National Forest LRMP at IV–101). The management goals for the SRA are "to protect or enhance key fish and wildlife habitats; protect sensitive watershed areas; and protect recreation values." (Id.). The Siskiyou National Forest LRMP Standard and Guideline MA7–10, which applies in SRAs, provides that: "Mining activity is permitted in accordance with mining regulations and an approved operating plan." (Id. at IV–103).[2]

Another management area included in the Siskiyou National Forest LRMP is

Wilderness Areas. (Id. at IV–69). The Siskiyou National Forest LRMP Standard and Guideline MA1–10, which applies to Wilderness Areas, permits mining only on valid claims subject to approved operating plans. (Id. at IV–73).

The Siskiyou National Forest LRMP contains a management area designated Research Natural Area (RNA). (Id. at IV–81). The Siskiyou National Forest LRMP Standard and Guideline MA3–8, which applies to RNAs, permits development of valid claims existing prior to RNA designation subject to an approved operating plan. (Id. at IV–83). Special areas, such as Wilderness, Wild and Scenic Rivers designated "Wild", and various administrative sites are withdrawn from mineral entry under the Siskiyou National Forest LRMP. (AR at 200).

In 1994, the "Record of Decision for Amendments to Forest Service and Bureau of Land Management Planning Documents Within the Range of the Northern Spotted Owl" (Northwest Forest Plan) was adopted. (AR at 43; ROD at 1–4). The Northwest Forest Plan amended the LRMPs for national forests within the range of the Northern Spotted Owl, including the Siskiyou National Forest's LRMP. (ROD at 11–12).

The Northwest Forest Plan sets forth a four-part Aquatic Conservation Strategy (ACS) to maintain and restore riparian and aquatic ecosystems and protect fish habitat on federal land. (ROD at B9–12). One part of the ACS involves designation of

---

1. The court will include defendants' statement of facts No. 1, 2, 3, 5, 8, 16, 17, 20, 26, 27, 28, 29, and 30 in the discussion.

 Plaintiff objects to defendants' statement of Facts No. 4, 6, 7, 9, 10, 11, 12, and 18 as statements of law from judicial opinions. The court agrees and these statements will be included in the discussion.

 Plaintiff objects to defendants' statement of facts No. 19, 24, and 25 arguing that this is defendants' interpretation of the law, and the allegations are not supported by any underlying evidence. The court agrees that these statements are legal conclusions, and these statements will be included in the discussion.

2. Defendants dispute this fact arguing that at no time was the Siskiyou National Forest's mineral policy contrary to the 1872 Mining Law or 36 C.F.R. § 228.4 such that all individuals intending to mine Silver Creek were required to submit a plan of operations. Defendants contend that they did not violate the Standards and Guidelines of the SRA (MA7) when accepting the NOIs, as Standard and Guideline MA–7 was amended by the MM–1 Forest Plan Amendment. Defendants also contend that the MM–1 Decision Notice did not exclude amending the standards and Guidelines for SRAs from its scope.

Riparian Reserves, which are the areas in and along streams that provide habitat for aquatic species. Under the ACS, Riparian Reserves are used to maintain and restore riparian structures and functions in intermittent streams, confer benefits to riparian-dependent and associated species other than fish, enhance habitat conservation for organisms that are dependent on the transition zone between upslope and riparian areas, improve travel and dispersal corridors for many terrestrial animals and plants, provide greater connectivity of the watershed, and serve as connectivity corridors among the Late–Successional Reserves. (ROD at B–12–13). The Northwest Forest Plan contains Standards and Guidelines that apply to Riparian Reserves. (ROD at B12, C30–C38).

Standard and Guideline MM–1, which applies to Riparian Reserves, requires "a reclamation plan, approved Plan of Operations, and reclamation bond for all minerals operations that include Riparian Reserves." (ROD at C–34). The Northwest Forest Plan provides that "[n]one of these standards and guidelines applies where they would be contrary to existing law or regulation, or where they would require the agencies to take actions for which they do not have authority." (ROD at C–1).

At the time the Northwest Forest Plan amended the Siskiyou National Forest LRMP, the Forest Service had regulations in effect governing mining on national forest lands, 36 C.F.R. §§ 228.1–15. Under these regulations, "a person proposing an action which 'might cause disturbance of the surface resources' is required to submit a Notice of Intent (NOI) to the Forest Service District Ranger on whose District the mining is proposed. The proponent is required to submit a Plan of Operations (POO) if the District Ranger determines 'that such operations will likely cause significant disturbance of surface resources.'" (AR at 200 citing 36 C.F.R. § 228.4). "If a POO is submitted, the Forest Service conducts an Environmental Analysis resulting in an Environmental Assessment (EA) or Environmental Impact Statement (EIS). Several types of activities are specifically

exempted from the requirement to submit an NOI or a POO." (Id. citing 36 C.F.R. § 228.4(a)).

The Forest Service found that "[t]he requirements of MM–1 conflict with 36 CFR 228.4 in that MM–1 would require the operator to submit a POO for *all* operations in Riparian Reserves, regardless of whether the operation would likely cause a significant disturbance of surface resources, and regardless of whether the operation is excluded from the requirements to submit a POO under the Regulations." (Id. emphasis in original). The Forest Service amended the LRMP for the Siskiyou National Forest "to be consistent with both the minerals regulations and the goals of the NWFP [Northwest Forest Plan]." (AR at 201–202).

On January 12, 1996, defendants issued a Notice accompanying an Environmental Assessment (EA), dated January 8, 1996. (AR at 198 and 225). The EA was entitled: "Proposal to Amend the Siskiyou National Forest Land and Resource Management Plan to Be Consistent With the 36 CFR 228 Regulations." (AR at 198). The proposed amendment was designed to "resolve an inconsistency in direction regarding mining in Riparian Reserves and discloses the environmental impacts of alternatives proposed to correct the inconsistency." (AR at 199, 225). "The proposed action [was] to amend the Riparian Reserve standard and guideline, MM–1 of the Siskiyou National Forest LRMP to (a) remove the requirement that an approved Plan of Operations and reclamation bond is required for *all* mineral operations that include Riparian Reserves, and (b) add the requirement that an approved Plan of Operation and reclamation bond shall be required if the District Ranger determines on the basis of a Notice of Intention and site-specific conditions that such mining operations will likely cause significant disturbance of the surface resources (specifically including those within the Riparian Reserves). This approach will help attain the objectives of the Aquatic Conservation

Strategy by directing administration of mining activities in Riparian Reserves in a manner that has an improved likelihood of protecting such areas. . . ." (AR at 203).

Three alternatives were discussed in the EA: no action; revision of the regulations at 36 C.F.R. § 228; or amendment of the Standard and Guideline MM–1. (AR at 205–206). The EA discussed the alternatives at pages 9–14 (AR 207–212), noting that a No Action Alternative was unacceptable, since it would result in noncompliance with the stipulated agreement in *NWF v. Agpaoa.* (AR at 207).

Alternative 3, which was the selected alternative, would revise Standard and Guideline MM–1 by amending the Siskiyou National Forest LRMP as follows:

"Require a reclamation plan, approved Plan of Operations, and reclamation bond for mineral operations that are likely to significantly retard or prevent attainment of the Aquatic Conservation Strategy. Such plans and bonds must address the costs of removing facilities, equipment and materials; recontouring disturbed areas, where practicable, to near pre-mining topography; isolating and neutralizing or removing toxic or potentially toxic materials; salvage and replacement of topsoil; and seedbed preparation and revegetation to meet Aquatic Conservation Strategy objectives." (AR at 207).

Defendants considered the alternative of "withdrawing all Riparian Reserves on the Siskiyou National Forest from mineral entry under the General Mining Law of 1872. This Alternative was eliminated from detailed study because it would not meet the underlying need for the proposed action, part of which is to permit continued exploration and production of minerals consistent with National Forest Management Policies and the General Mining Law of 1872." (AR at 207–208).

On February 12, 1996, plaintiff submitted comments on the draft EA. (AR at 226–251). On April 1, 1996, defendants issued a revised EA, Decision Notice, and "Finding of No Significant Impact." (AR at 284–331). The alternative of withdrawing specific stream courses, was rejected in the revised EA, because defendants considered it "outside the scope of this EA . . . because they do not respond to the need to clarify management direction and provide a congruent and effective approach to reconcile direction." (AR at 300). The Forest Service issued a Finding of No Significant Impact (FONSI), determining that the proposed action would not significantly affect the quality of the human environment. (AR at 329).

In the Decision Notice, defendants selected Alternative 3, thus amending MM–1. The amended MM–1 requires plans of operations, reclamation plans, and reclamation bonds only for mining activities in Riparian Reserves that are "likely to significantly retard or prevent attainment of the Aquatic Conservation Strategy objectives." (AR at 322).

"Suction dredging for gold is a common activity in many stream channels in lands that are managed by public agencies." (Effects of Suction Dredging on Steams, September 29, 1995 at 1). The EA describes suction dredging as follows:

"Suction dredging is a method of mining whereby minerals are extracted from streams/rivers. A suction dredge is a centrifugal pump mounted on floats in which the material is lifted by pumping through a suction hose. 'Suction dredges utilize high pressure water pumps driven by gasoline-powered motors which create suction in a flexible intake pipe (2 to 12″ diameter). A mixture of streambed sediment and water is vacuumed into the intake pipe and passes over a sluice box mounted on a floating barge. Dense particles (including gold) are trapped in the sluice box.' " (AR at 288).

A report prepared for defendants describes suction dredging as follows:

"Suction dredges utilize high pressure water pumps driven by gasoline-powered motors which create suction in a flexible intake pipe (2–12″ diameter). A

mixture of streambed sediment and water is vacuumed into the intake pipe and passed over a sluice box mounted on a floating barge. Dense particles (including gold) are trapped in the sluice box. The remainder of the entrained material is discharged into the stream as 'tailings' or 'spoils', which can form large piles where dredges have remained in one location for long." (Plaintiff's Exhibit A at 4).

On May 20, 1996, plaintiff filed a notice of appeal from the "Proposal to Amend the Siskiyou National Forest Land Management and Resources Plan for Mineral Operations in Riparian Reserves Pursuant to 36 CFR 217." (AR at 333, 379). On June 20, 1996, the Forest Supervisor wrote to plaintiff with regard to its appeal. (AR at 379–387). The memorandum of the Forest Supervisor addressed each of the issues raised by plaintiff. The Forest Supervisor noted that "[t]he amendment does not, on its own, authorize any surface-disturbing activities or direct changes to the environmental status quo." (AR at 379).

On August 30, 1996, the Deputy Regional Forester sent a letter to plaintiff affirming the decision to amend the Siskiyou National Forest LRMP. (AR at 388). On September 23, 1996, the Chief of the Forest Service notified plaintiff that he declined to exercise discretionary review of the Deputy Regional Forester's decision. (AR at 392).

Standard and Guideline MM–1 was amended as follows:

"(a) Require a reclamation plan, approved Plan of Operations and reclamation bond for mineral operations that are likely to significantly retard or prevent attainment of the Aquatic Conservation Strategy Objectives. Such plans and bonds must address the costs of removing facilities, equipment and materials; recontouring disturbed areas, where practicable, to near pre-mining topography; isolating and neutralizing or removing toxic or potentially toxic materials; salvage and replacement of topsoil; and seedbed preparation and revegetation to meet Aquatic Conservation Strategy objectives.

(b) The responsible official will document the basis for a determination that the proposed activity would not likely cause significant disturbance of surface resources nor significantly retard or prevent the attainment of the Aquatic Conservation Strategy objectives. If this determination were made, it would not necessitate submission of a Plan of Operations."

Defendants have applied revised Standard and Guideline MM–1, allowing certain mining operations to proceed in Riparian Reserves without plans of operation, reclamation plans, or reclamation bonds. (AR at 455, 476, 493). Defendants allowed certain mining operations to proceed under a NOI, based on determinations made by the District Ranger. (AR at 455, 476, 493).

During 1998, the Galice Ranger District received five NOIs for mining operations on eleven claims on Silver Creek. (AR at 452, 466, 474, 485, 489). Daniel Crittenden, District Ranger, responded to the receipt of two NOIs from Michael G. Morris with letters, which stated that it was Mr. Crittenden's understanding that Mr. Morris would dredge no more than 40 cubic yards of in-stream material with a 6″ dredge. (AR at 453, 455).

Mr. Crittenden responded to the receipt of a NOI from Marvin Burns with a letter, which stated that it was Mr. Crittenden's understanding that Mr. Burns would dredge no more than 50 cubic yards of in-stream material with a 5″ dredge. (AR at 476). Mr. Crittenden responded to the receipt of a NOI from James Gilchrist with a letter, which stated that it was Mr. Crittenden's understanding that Mr. Gilchrist would dredge no more than 45 cubic yards of in-stream material with a 5″ dredge. (AR at 476).

Three of the five NOIs were for suction dredging operations, and two NOIs were for panning. Two of the three NOIs for suction dredging operations occurred on

Silver Creek during the 1998 operating season. (Defendants' response to plaintiff's undisputed facts 20).

After receiving NOIs to mine Silver Creek, defendants did not prepare an EA for any of the individual suction dredge operations or an EA to assess the cumulative impacts from all the operations. (Defendants' Answer to Plaintiff's First Amended Complaint at ¶ 85). The Siskiyou National Forest does not have a categorical exclusion for suction dredging mining operations. (Defendants' Answer to Plaintiff's First Amended Complaint at ¶ 86). Defendants did not require plans of operation, reclamation plans, or reclamation bonds for any of the operations in question on Silver Creek. (AR at 476, 493, 453, 455).

In April 1995, the Forest Service issued the "Silver Creek National Watershed Analysis Galice Ranger District Siskiyou National Forest" (AR at 44). The purpose of the watershed analysis was to "examine the past and current ecological condition of the watershed, explore the major processes at work in the drainage, determine if there are recognizable trends to these processes and suggest a desired condition for the future of the area." (AR at 50). The watershed analysis "addressed mining and fisheries and concluded . . . that fisheries are in very good condition in Silver Creek and that mining has had very low negative effects on fisheries." (AR at 165).

Silver Creek is a 17.7 mile-long tributary[3] to the National Wild and Scenic Illinois River, and is located in southwest Oregon. (AR at 5). Much of the Silver Creek watershed is roadless, has had relatively little logging, and has had few, if any, historic diversions for irrigation. (AR at 4, 5, 87, 98). Silver Creek has been identified as "one of two most important tributaries, in terms of fish production", in the Illinois River Basin. (AR at 2). Silver Creek has exceptionally pure, clean, and clear water, which provides excellent spawning and rearing habitat for many species of fish. (AR at 11, 21).

Silver Creek contains populations of anadromous fish, including fall-run chinook salmon, steelhead, and sea-run cutthroat trout. (AR at 13, 54). Silver Creek contains resident rainbow and cutthroat trout and year round populations of non-salmonid fish, such as sculpins. (AR at 12). Silver Creek is designated as a Riparian Reserve, Tier 1 Key Watershed under the Northwest Forest Plan, and a Supplemental Resource Area (SRA) under the Siskiyou National Forest LRMP. (AR at 2, 50; Siskiyou National Forest LRMP IV–101).

## II. *LEGAL STANDARDS*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a moving party is entitled to summary judgment as a matter of law "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c); *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir.), *cert. denied*, 502 U.S. 994, 112 S.Ct. 617, 116 L.Ed.2d 639 (1991). The moving party bears the initial burden of proof. *See Rebel Oil Company, Inc. v. Atlantic Richfield Company*, 51 F.3d 1421, 1435 (9th Cir.), *cert. denied*, 516 U.S. 987, 116 S.Ct. 515, 133 L.Ed.2d 424 (1995). The moving party meets this burden by identifying portions of the record on file which demonstrates the absence of any genuine issue of material fact. *Id.*

In assessing whether a party has met their burden, the court must view the evidence in the light most favorable to the nonmoving party. *Allen v. City of Los Angeles*, 66 F.3d 1052 (9th Cir.1995). All reasonable inferences are drawn in favor of the nonmovant. *Id.* If the moving party meets their burden, the burden shifts to the opposing party to present specific facts which show there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Auvil v. CBS*

---

**3.** Defendants state that there are actually 19.2 miles in the main stream of Silver Creek, but that plaintiff's citation to the administrative record is correct.

*"60 Minutes"*, 67 F.3d 816 (9th Cir.1995), *cert. denied,* 517 U.S. 1167, 116 S.Ct. 1567, 134 L.Ed.2d 666 (1996). The nonmoving party cannot carry their burden by relying solely on the facts alleged in their pleadings. *Leonard v. Clark,* 12 F.3d 885, 888 (9th Cir.1993). Instead, their response, by affidavits or as otherwise provided in Rule 56, must designate specific facts showing there is a genuine issue for trial. *Id.*

## III. *DISCUSSION*

### NFMA Claim

Defendants move for summary judgment on plaintiff's NFMA claim arguing that plaintiff failed to demonstrate that defendants have violated the NFMA, because: a) the EA approved an amendment to the Siskiyou National Forest LRMP, not specific mining operations; b) the amended LRMP gives the Forest Service discretion to determine when a Proposed Plan of Operations, reclamation bond, and reclamation plan are necessary; c) the Department of the Interior determines whether a mining claim is valid; d) national forests are administered under multiple use objectives; and e) the Forest Service has discretion to rely on its scientists in determining whether particular actions are appropriate and can be approved.

In response, plaintiff argues that defendants failed to refute evidence that they allowed mining operations to proceed in the Silver Creek SRA without approved operating plans in violation of NFMA.

In reply, defendants argue that: 1) the Decision Notice amending the Siskiyou National Forest LRMP never excluded the Standards and Guidelines for SRAs; 2) it was clearly the intent of the Forest Service, by amending Standard and Guideline MM–1, that Standard and Guideline MA 7–10 would work differently, but would not be changed; 3) all stream courses within the Siskiyou National Forest are Riparian Reserves regardless of their management allocation and regardless of whether they are located in Wilderness, RNAs, or SRAs; 4) Standard and Guideline MM–1 never applied to the Siskiyou National Forest, because it was contrary to existing regulations; and 5) plaintiff's assertion that the NOIs prove the Forest Service conducts only cursory analysis, based on limited information, is inaccurate based on the following: a) only two individuals conducted any dredging activities in 1998; b) a number of visits were conducted by Forest Service personnel; and c) plaintiff made six Freedom of Information Act requests regarding suction dredge mining on Silver Creek.

Plaintiff moves for summary judgment on its claim that defendants violated NFMA arguing that defendants violated NFMA by failing to require Plans of Operation for suction dredge mining on Silver Creek, a SRA, as required by Standard and Guideline MA7–10. In response, defendants argue that: 1) plaintiff's assertion ignores that the MM–1 decision never excluded the Standards and Guidelines for SRAs; and 2) plaintiff's claim is moot. In reply, plaintiff argues that: 1) amending Standard and Guideline MM–1 did not simultaneously change Standards and Guidelines for other management areas; and 2) plaintiff's claim is not moot.

The NFMA, 16 U.S.C. § 1600 *et seq.,* was enacted in 1976 as amendments to the Forest and Rangeland Renewable Resources Planning Act of 1974. Congress directed the Secretary of Agriculture to develop and maintain LRMPs for all national forests. *Citizens for Environmental Quality v. U.S.,* 731 F.Supp. 970, 976 (D.Colo.1989).

Section 6(g) of NFMA directs the Secretary of Agriculture to issue regulations that are consistent with the principles of the Multiple–Use Sustained Yield Act of 1960 (MUSYA), 16 U.S.C. § 528 *et seq..* Under MUSYA, Congress directed that the national forests be administered for multiple uses. "The principles of MUSYA were expressly incorporated into the statutory and regulatory scheme of NFMA." *Sierra Club v. Espy,* 38 F.3d 792 (5th Cir.1994).

NFMA requires the Forest Service to develop LRMPs to meet multiple-use ob-

jectives. *See Mt. Graham Red Squirrel v. Madigan,* 954 F.2d 1441, 1460 (9th Cir. 1992). Baseline standards, which are designed to ensure sustainable development of renewable resources and protect the environment, are implemented through regulations called "Minimum Management Requirements" of "MMRs". 36 C.F.R. § 219.27.

Most National Forest lands located in the western United States are open to mining under the General Mining Law of 1872, 30 U.S.C. §§ 21–54. Under the provisions of the General Mining Act of 1872, an individual may enter and explore public lands in search of valuable minerals. 30 U.S.C. § 22.

■ After valuable minerals are discovered, the claimant may file a mining claim, which if approved, entitles the claimant to the right of exclusive possession of that claim, as long as the requirements of the Mining Act are met. *See Swanson v. Babbitt,* 3 F.3d 1348, 1350 (9th Cir.1993). A mining claimant has the right to exclusive possession of the surface resources within their claim for the purpose of mining if he has made a valid discovery. *Lara v. Secretary of Interior of the United States,* 820 F.2d 1535, 1537 (9th Cir.1987); 30 U.S.C. § 26. The Bureau of Land Management, United States Department of the Interior, has jurisdiction to determine the validity of mining claims on public lands and to administer the mineral patent process. *See Clouser v. Espy,* 42 F.3d 1522, 1525 (9th Cir.1994), *cert. denied,* 515 U.S. 1141, 115 S.Ct. 2577, 132 L.Ed.2d 827 (1995); *United States v. Bagwell,* 961 F.2d 1450, 153–1454 (9th Cir.1992) (citations omitted).

■ When a mining claimant has a valid, unpatented mining claim, the primary title and paramount ownership of the land remains with the government. *United States v. Rizzinelli,* 182 F. 675, 681 (D.Idaho 1910); *Teller v. United States,*

113 F. 273 (8th Cir.1901). The United States government has a reversionary interest in the possessory right of the mining claimant, which it is entitled to protect against wasteful and unlawful uses. *Rizzinelli,* 182 F. at 684. Until a patent is issued, the government has broad authority to manage the public lands. *See Reed v. Morton,* 480 F.2d 634, 642 (9th Cir.), *cert. denied,* 414 U.S. 1064, 94 S.Ct. 571, 38 L.Ed.2d 469 (1973). A mining claimant cannot bring a successful "takings clause challenge" unless the validity of the claim has been established. *See Clouser,* 42 F.3d at 1535 fn. 15.

■ Congress' authority to enact laws affecting the public lands is derived from the Property Clause of the United States Constitution, Art. IV § 3 cl. 2. *Kleppe v. New Mexico,* 426 U.S. 529, 535, 96 S.Ct. 2285, 49 L.Ed.2d 34 (1976). In exercise of its constitutional authority, Congress enacted 16 U.S.C. §§ 478 and 551 and gave the Secretary of Agriculture the authority to make rules and regulations for the protection and preservation of national forests, and persons entering upon national forest lands for the purpose of exploiting mineral resources must comply with those regulations. *United States v. Weiss,* 642 F.2d 296, 298 (9th Cir.1981); 16 U.S.C. § 478. The Secretary of Agriculture may enact reasonable rules and regulations which do not impermissibly encroach upon the rights of use and enjoyment of valid claims under the Mining Law. *See Id.* The Forest Service may also regulate mining activities through their LRMPs. *See Pacific Rivers Council v. Thomas,* 873 F.Supp. 365, 372 (D.Idaho 1995).

36 C.F.R. Part 228 sets forth rules and procedures intended to regulate the use of the surface of national forest lands in connection with mining activities authorized under the Mining Act. 36 C.F.R. § 228.1. Under 36 C.F.R. § 228.4(a) any person proposing to conduct operations[4] which

---

4. 36 C.F.R. § 228.3(a) defines operations as: "All functions, work, and activities in connection with prospecting, exploration, development, mining or processing of mineral resources and all uses reasonably incident thereto, including roads and other means of access on lands subject to the regulations in

might cause a disturbance of surface resources must submit a notice of intent to operate to the District Ranger. If the District Ranger determines that such operations will likely cause a significant disturbance of surface resources, the operator must submit a proposed plan of operations to the District Ranger. The District Ranger will then complete an environmental assessment in connection with the proposed operating plan, and determine whether the preparation of an environmental statement is required. 36 C.F.R. § 228.4(f). Where it is feasible, operations are to be conducted to minimize adverse environmental impacts on National Forest surface resources. 36 C.F.R. § 228.8.

Under certain conditions, a plan of operations is not required. 36 C.F.R § 228.4(a)(1) provides that:

"The requirements to submit a plan of operations shall not apply:

(i) To operations which will be limited to the use of vehicles on existing public roads or roads used and maintained for National Forest purposes;

(ii) To individuals desiring to search for and occasionally remove small mineral samples or specimens;

(iii) To prospecting and sampling which will not cause significant surface resource disturbance and will not involve removal of more than a reasonable amount of mineral deposit for analysis and study;

(iv) To marking and monumenting a mining claim; and

(v) To subsurface operations which will not cause significant surface resource disturbance."

Under certain circumstances, a NOI is not required. 36 C.F.R. § 228.4(a)(2) provides:

"A notice of intent need not be filed:

(i) Where a plan of operations is submitted for approval in lieu thereof;

(ii) For operations excepted in paragraph (a)(1) of this section from the requirement to file a plan of operations;

this part, regardless of whether said opera-

(iii) For operations which will not involve the use of mechanized earthmoving equipment such as bulldozers or backhoes and will not involve the cutting of trees. Each notice of intent to operate shall provide information sufficient to identify the area involved, the nature of the proposed operations, the route of access to the area of operations and the method of transport. If a notice of intent is filed, the District Ranger will, within 15 days of receipt thereof, notify the operator whether a plan of operations is required."

■■ The requirement that a claimant file an operating plan is reasonable and consistent with the mining laws. *United States v. Doremus*, 888 F.2d 630, 632 (9th Cir.1989), *cert. denied*, 498 U.S. 1046, 111 S.Ct. 751, 112 L.Ed.2d 772 (1991). The Forest Service has the authority to regulate mining operations in the national forest by requiring miners to submit for approval operating plans for their proposed operations. *See Clouser v. Espy*, 42 F.3d 1522 (9th Cir.1994), *cert. denied*, 515 U.S. 1141, 115 S.Ct. 2577, 132 L.Ed.2d 827 (1995). Although the Forest Service cannot categorically deny a reasonable plan of operations, it can reject an unreasonable plan and prohibit mining activity until it has evaluated the plan and imposed mitigation measures. *Baker v. U.S. Dept. Of Agriculture*, 928 F.Supp. 1513, 1518 (D.Idaho 1996).

■■ In *Weiss*, the court found that where mining activities disturb the national forest lands, Forest Service regulation is proper. *Weiss*, 642 F.2d at 298. The Forest Service can regulate conduct that is reasonably incident to mining. *Clouser*, 42 F.3d at 1530. The Forest Service can prohibit the initiation or continuation of mining operations for failure to abide by applicable environmental requirements. *Pacific Rivers Council v. Thomas*, 873 F.Supp. 365, 374 (D.Idaho 1995).

tions take place on or off mining claims."

In this case, the court must determine whether the Forest Service's decision to allow mining operations to proceed within a SRA without approved plans of operation was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law. *See Nevada Land Action Ass'n v. U.S. Forest Service,* 8 F.3d 713, 716 (9th Cir.1993).

The Siskiyou National Forest LRMP divides the forest into fourteen different management areas. Each management area has its own standards and guidelines, in addition to forest-wide standards and guidelines. Under the LRMP, "[w]here overlap occurs between management area allocations, ... the most stringent restrictions apply." (Siskiyou National Forest LRMP at IV–65).

One of the management areas included in the Siskiyou National Forest LRMP is a SRA, which comprise 26,921 acres of the Siskiyou National Forest. (Id.). Standard and Guideline MA7–10 governs mining in SRAs, and provides that mining activity is permitted in SRAs in accordance with the mining regulations and an approved operating plan. (Id. at IV–103). Silver Creek is designated as a SRA. (Id. at IV–101).

When the Northwest Forest Plan amended the Siskiyou National Forest LRMP, it added new Standards and Guidelines to the Siskiyou National Forest LRMP, including Standard and Guideline MM–1. (Northwest Forest Plan Record of Decision (ROD) at 7, C–2). The Northwest Forest Plan provided that "[o]nly those existing plan standards and guidelines in conflict with this decision are replaced. Where existing plans are more restrictive or provide greater benefits to late-successional forest related species than Attachment A, the existing plan standards and guidelines will continue." (ROD at 12). The Northwest Forest Plan did not change Standard and Guideline MA7–10; there was no conflict between MA7–10 and MM–1.

During 1998, the Galice Ranger District received five NOIs for mining operations on eleven claims on Silver Creek. (AR at 452, 466, 474, 485, 489). Three of the five NOIs were for suction dredging operations, and two NOIs were for panning. Two suction dredging operations occurred on Silver Creek during the 1998 operating season. (Defendants' response to plaintiff's undisputed facts 20). Defendants did not require plans of operation for the mining operations on Silver Creek. (AR at 476, 493, 453, 455).

Defendants argue that the MM–1 Decision Notice never excluded standards and guidelines for SRAs, and that it was the intent of the Forest Service that, by amending Standard and Guideline MM–1, Standard and Guideline MA7–10 would work differently. There is no evidence in the administrative record that the Decision Notice amended Standard and Guideline MA7–10 or that by amending Standard and Guideline MM–1, "MA7–10 would work differently". The EA only addresses the "conflict between the Northwest Forest Plan and 36 CFR 228.4". (AR at 201, 290–293). The proposed action in the EA was "to amend the Riparian Reserve standard and guideline, MM–1 of the Siskiyou National Forest LRMP ...". (Id. at 203, 207, 225). The EA, the Notice of Decision, and the "Notice" do not mention Standard and Guideline MA7–10. (Id. at 198–224, 225, 284–308, 322–331). If the Forest Service seeks to amend Standard and Guideline MA7–10, it must go through the proper procedures, which require notice and public participation. 36 C.F.R. §§ 219.6(b) and 219.10(f); *See Arizona Cattle Growers' Association v. Cartwright,* 29 F.Supp.2d 1100, 1115 (D.Ariz.1998).

■ "An agency's interpretation of its own regulations controls unless it is plainly erroneous or inconsistent with the regulations." *See Friends of Southeast's Future v. Morrison,* 153 F.3d 1059, 1069 (9th Cir. 1998) (citations omitted); *Nevada Land Ass'n,* 8 F.3d at 717 (citations and quotations omitted). In this case, the Forest Service's interpretation of the effect of amended Standard and Guideline MM–1

on Standard and Guideline MA7–10 is clearly erroneous and inconsistent with the plain language of the Standards and Guidelines.

The LRMP Standard and Guideline MA7–10 requires a plan of operation for any mining operations in SRA. The revised Standard and Guideline for Riparian Reserves does not require a plan of operation. Under the LRMP, when management zones overlap, the stricter guidelines apply. In this case the guideline for SRAs is stricter and is applicable.

Defendants failed to require a plan of operations for any of the mining operations on Silver Creek during the 1998 mining season in violation of the LRMP Standard and Guideline MA7–10. The Forest Service must comply with the requirements of their Forest Plans, and failure to comply violates NFMA. *See Friends of Southeast's Future v. Morrison,* 153 F.3d 1059, 1070–1071 (9th Cir.1998). The court finds that defendants' decision to allow mining operations to proceed within a SRA without approved plans of operation was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law.

Defendants argue that this claim is moot, and that it does not fall under the exception of "capable of repetition yet evading review", because plaintiff had advanced notice, through a Freedom of Information Act request. Plaintiff argues that the claim is not moot, because, although the 1998 mining season has ended, it is reasonably certain that defendants will continue to violate NFMA in 1999, and the court can grant plaintiff relief by ordering defendants to comply with NFMA. In addition, plaintiff argues that the claim falls under the "capable of repetition yet evading review" exception, because the suction dredge season lasts only four months and it is reasonably likely that suction dredge operations will continue on Silver Creek.

The defendants bear a heavy burden to demonstrate mootness. *County of Los Angeles v. Davis,* 440 U.S. 625, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979). An action is moot where the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome. *Northwest Environmental Defense Center v. Gordon,* 849 F.2d 1241, 1244 (9th Cir. 1988) (quotation and citations omitted). "The basic question in determining mootness is whether there is a present controversy as to which effective relief can be granted." *Id.* (citation omitted). As long as effective relief may still be available, the controversy remains live and present. *Id.* at 1245. The court does not have jurisdiction over a claim to which no relief can be granted. *Headwaters, Inc. v. Bureau of Land Management, Medford District,* 893 F.2d 1012, 1015 (9th Cir.1989) (citation omitted).

One exception to the mootness doctrine is acts that are capable of repetition yet evading review. *Headwaters,* 893 F.2d at 1016. "Under this exception, federal courts may exercise jurisdiction over otherwise moot matters in which 1) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration, and 2) there is a reasonable expectation that the same complaining party would be subjected to the same action again." *Id.* (citation omitted). This exception is narrow and applies only in exceptional circumstances. *Id.* (citation omitted). To satisfy the second requirement, the plaintiff must make a reasonable showing that he will again be subject to the challenged activity. *U.S. v. Max,* 779 F.2d 1415, 1416 (9th Cir.1986).

In this case, plaintiff's claim is not moot. The court can grant effective relief by ordering defendants to comply with its own regulations regarding the requirement of an approved plan of operation for mining operations in SRAs. *See Columbia Basin Land Protection Association v. Schlesinger,* 643 F.2d 585, 591 fn. 1 (9th Cir.1981). The violation also falls within the exception of an action which is capable of repetition yet evading review: the mining season is of a short duration, four

months long, and it is reasonably likely that defendants will allow mining operations to continue on Silver Creek without requiring an approved plan of operations. Therefore, this claim is not moot. *See Oregon Environmental Council v. Kunzman,* 714 F.2d 901, 903 (9th Cir.1983).

## Foreseeable/Cumulative Impacts and Need to Prepare EIS

Defendants move for summary judgment arguing that: a) the Forest Service was not required to prepare an EIS; b) the EA fully comports with NEPA as to analysis of environmental impacts; c) the EA fully comports with NEPA as to its discussion of cumulative impacts.

In response, plaintiff argues that: 1) defendants did not address impacts to aquatic resources in the EA; 2) defendants did not include a cumulative impacts analysis in the EA; and 3) defendants were required to prepare an EIS prior to amending the Siskiyou National Forest LRMP.

In reply, defendants argue that: 1) defendants did address potential impacts to aquatic resources; 2) the cumulative impacts analysis in the EA comports with NEPA; and 3) an EIS was not required to amend the LRMP.

Plaintiff moves for summary judgment based on the following arguments: 1) the EA does not adequately disclose the environmental impacts of amending Standard and Guideline MM–1—the EA neglects to discuss critical, cumulative, and foreseeable environmental consequences in violation of NEPA, including foreseeable impacts to Aquatic species and habitat and cumulative impacts of mining operations in Riparian Reserves; and 2) the defendants were required to prepare an EIS before amending Standard and Guideline MM–1, because there are substantial questions regarding the environmental impacts of the revision.

In response, defendants argue that: 1) the EA adequately addresses the effects of sedimentation; 2) the EA did consider impacts on aquatic species and habitat—the Forest Service took a "hard look" at any potential impacts on aquatic resources; 3) plaintiff incorrectly suggests that impacts from suction dredging were required to be discussed in the EA—the sole purpose of the EA was to amend MM–1, not to study individual mining operations—the MM–1 EA checklist permits the Forest Service to determine whether the proposed operation requires a plan of operations and NEPA analysis; 4) the EA fully comports with NEPA regarding cumulative impacts; and 5) an EIS was not required.

In reply, plaintiff argues that: 1) defendants did not take a "hard look" at the environmental consequences of amending MM–1; 2) the cumulative impacts of multiple suction dredge operations are not speculative; 3) an EIS is required because there are substantial questions regarding the environmental impacts of the proposed action; and 4) plaintiff's claims regarding the 1998 suction dredge season are not moot.

NEPA, 42 U.S.C. § 4321 *et seq.,* was enacted in 1969, and became effective in January of 1970. The Council on Environmental Quality (CEQ) promulgated regulations governing an agency's obligations and responsibilities in applying NEPA. 40 C.F.R. §§ 1500–1508. CEQ regulations describe three categories of agency action and specify the kind of agency review of environmental issues that is required for each. The categories are: (1) actions that may significantly affect the environment and thus generally require a full environmental impact statement (EIS), 40 C.F.R. § 1501.4(a)(1); (2) actions that may or may not have a significant environmental impact and thus ordinarily require only a more limited environmental assessment (EA) to determine whether an EIS is necessary, 40 C.F.R. § 1501.4(c); and (3) actions that typically do not have a significant effect on the human environment and thus qualify for a "categorical exclusion" from the requirements for the preparation of an EA or an EIS, 40 C.F.R. §§ 1500.4(p), 1501.4(a)(2) and 1508.4.

The court reviews the Forest Service's decision not to prepare an EIS under the arbitrary and capricious standard. *Idaho Sporting Congress v. Thomas,* 137 F.3d 1146, 1149 (9th Cir.1998); *Northcoast Environmental Center v. Glickman,* 136 F.3d 660, 666–667 (9th Cir. 1998); *Greenpeace Action v. Franklin,* 14 F.3d 1324 (9th Cir.1992). The arbitrary and capricious standard requires the court to ensure that an agency has taken the requisite "hard look" at the environmental consequences of its proposed action, carefully reviewing the record to ascertain whether the agency decision is "founded on a reasoned evaluation 'of the relevant factors'" and whether there has been clear error in judgment. *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)). The inquiry must be searching and careful, but the standard of review is a narrow one. *Id.* An agency's decision may only be called arbitrary and capricious if the agency: relied on factors which Congress did not intend it to consider; entirely failed to consider an important aspect of the problem; offered an explanation for its decision that runs counter to the evidence before the agency; or offered an explanation that is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Southwest Ctr. for Biological Diversity v. U.S. Forest Service,* 100 F.3d 1443, 1448 (9th Cir.1996) (citation omitted).

The court cannot substitute its judgment for that of the agency regarding the environmental consequences of the agency's actions. *Association of Pub. Agency Customers v. Bonneville Power Administration,* 126 F.3d 1158, 1183 (9th Cir.1997). Courts reviewing agency actions under NEPA may not require agencies "to elevate environmental considerations over other appropriate considerations." *Strycker's Bay Neighborhood Council, Inc. v. Karlen,* 444 U.S. 223, 227, 100 S.Ct. 497, 62 L.Ed.2d 433 (1980). Courts give "great deference to an agency determination regarding NEPA requirements." *City of Auburn v. U.S. Government,* 154 F.3d 1025, 1032 (9th Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 2367, 144 L.Ed.2d 771, 1999 WL 169424.

The goals of NEPA are to ensure the agency will have available and will carefully consider detailed information concerning significant environmental impacts when it makes a decision and to guarantee that the information is available to the public. *Inland Empire Public Lands v. U.S.F.S.,* 88 F.3d 754, 758 (9th Cir.1996) NEPA ensures a process, not a result. *Id.* The court must "ensure that the agency has adequately considered and disclosed the environmental impacts of its actions and that its decision was not arbitrary and capricious". *Strycker's Bay Neighborhood Council,* 444 U.S. at 227, 100 S.Ct. 497 (quoting *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council,* 462 U.S. 87, 97–98, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983)).

An EA must "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9(a). The information presented in the EA must be of "high quality", and include "accurate scientific analysis". 40 C.F.R. § 1500.1(b). An EA must include a brief discussion of the environmental impacts of the proposed action and alternatives. 40 C.F.R. § 1508.9(b).

An EA must provide an adequate analysis of any cumulative impacts resulting from the proposed action. *Northwest Environmental Defense Center v. Bonneville Power Administration,* 117 F.3d 1520, 1536 (9th Cir.1997). Cumulative impacts are defined as:

"the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-federal) or person un-

dertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7.

"To consider cumulative effects, some quantified or detailed information is required. Without such information, neither the courts nor the public, in reviewing the Forest Service's decisions, can be assured that the Forest Service provided the hard look that it is required to provide." *Neighbors of Cuddy Mountain v. U.S. Forest Service*, 137 F.3d 1372, 1379 (9th Cir.1998).

"When an agency is evaluating reasonably foreseeable significant adverse effects ... and there is incomplete or unavailable information, the agency shall always make clear that such information is lacking." 40 C.F.R. § 1502.22. If the incomplete information is essential to making a reasoned choice and the costs of obtaining it are not exorbitant, the agency is required to include the information. *Id.* If the information cannot be obtained, the agency must include a statement that: such information is incomplete or unavailable; the relevance of the information to evaluating reasonably foreseeable impacts; a summary of existing credible scientific evidence; and the agency's evaluation of impacts based upon theoretical approaches or research methods generally accepted in the scientific community. *Id.*

If the agency determines, based on the EA, not to prepare an EIS, the agency must prepare a Finding of No Significant Impact (FONSI). 40 C.F.R. § 1501.4(e). "The agency must adequately explain its decision not to prepare an EIS by supplying a convincing statement of reasons why potential effects are insignificant." *Oregon Natural Desert Association v. Singleton*, 47 F.Supp.2d 1182, 1193 (D.Or.) (quoting *Steamboaters v. F.E.R.C.*, 759 F.2d 1382, 1393 (9th Cir.1985)). The statement of reasons is crucial to determining whether the agency took a hard look at the potential environmental impacts of the project. *Id.*

"An agency must set forth a reasoned explanation for its decision and cannot simply assert that its decision will have an insignificant effect on the environment." *Marble Mountain Audubon Soc. v. Rice*, 914 F.2d 179, 182 (9th Cir.1990) (citation omitted). Conclusions that are reached without any study or supporting documentation are insufficient to satisfy an agency's NEPA obligations. *Id.* NEPA "regulations require agencies to identify any methodologies used and make explicit reference by footnote to the scientific and other sources relied upon for conclusions used in any EIS statement." *Idaho Sporting Congress*, 137 F.3d at 1150. NEPA also requires agencies to acknowledge issues raised by commenting parties and "provide a statement of reasons which demonstrates that it took a 'hard look' at the relevant evidence." *Steamboaters*, 759 F.2d at 1393.

In determining the adequacy of an environmental document, the court applies the "rule of reason", which "requires the agency to take a 'hard look' to determine whether the [document] contains a reasonably through discussion of the significant aspects of the probable environmental consequences. However, this 'reasonableness' review does not materially differ from an arbitrary and capricious review." *Idaho Sporting Congress*, 137 F.3d at 1149 (citations omitted).

The EA identifies "risks to aquatic resources and associated riparian values and uses" as one of the issues. (AR at 294). The EA acknowledges that many people were concerned about maintaining and restoring riparian areas and with the risk that mining within riparian areas poses to them. (Id.). The EA states that "the controversy comes from different beliefs on how to best reduce the risk to them. Some see extensive procedural requirements as best; others see contact, oversight, and procedures tailored to the site and operation as more effective." (Id.).

In comments to the EA, the Bureau of Land Management (BLM) raised concerns

regarding the screening process proposed by the Forest Service, stating that failure to develop a tight screening process could result in poor or no oversight of some operations that may be having adverse effects. (Plaintiff's Exhibit B). The BLM raised concerns about the cumulative impacts that small mining operations could have in Riparian Reserves. (Id.). The BLM also expressed the belief that "most mining activities may not be compatible with other resource objectives, nor will they meet the objectives of the aquatic conservation strategy." (Id.).

In comments on the EA, plaintiff expressed the following concerns: 36 C.F.R. § 228 did provide adequate regulation specific to Riparian Reserves; the EA's analysis of environmental impacts of suction dredge mining in Riparian Reserves did not reflect current scientific information, including the information contained in the "Harvey" report; the EA did not adequately describe the affected environment and its values; the EA contains no scientific evaluation of how stricter regulations of mining could benefit Riparian Reserves, at risk fish populations, and the public's safety and use and enjoyment of the National Forests; the EA fails to disclose how many of the placer mining claims in Riparian Reserves may be invalid or how the Forest Service determines when a mining claimant's rights would be violated; the Forest Service fails to consider and protect other values and resources on the National Forest and the rights of other citizens; the Forest Service fails to consider their multiple-use mandate; the EA does not adequately describe or assign value to the area affected by the proposed amendment, and therefore, it cannot adequately assess the environmental consequences of the amendment; Forest Service regulations are inadequate to protect late-spawning steelhead, cutthroat and resident trout and other aquatic species; suction dredging during June 15 to September 15 could cause mortalities to incubating trout eggs and developing alevins; EA fails to disclose the existence of mortality risk to incubating eggs and developing alevins of winter steelhead trout, sea-run cutthroat trout, resident cutthroat trout, and resident rainbow trout; the EA fails to consider cumulative impacts of mining operations; and the EA alters the objectives of the Aquatic Conservation Strategy without analyzing the effects of such alterations. (AR 226–237).

The EA refers to a Biological Assessment dated February 29, 1996 requesting formal consultation under the Endangered Species Act on the effects of proposed projects, including mining, in which a finding of "not likely to jeopardize the continued existence" was made. (Id.). This document is not part of the administrative record transmitted to the court. It is unclear whether that document specifically addressed the issue of amending Standard and Guideline MM–1 to eliminate the mandatory requirements of a POO, reclamation plan, and reclamation bond for all mining operations in Riparian Reserves.

In the section of the EA entitled, "Environmental and Program Consequences of the Alternatives", the Forest Service concluded that the proposed alternative "would present a low level of risk to aquatic resources and associated riparian values and uses," and that the proposed alternative would have the "least potential for negative impacts on resources such as wildlife, soils, and recreation." (AR 300, 303–304). The EA contains the following information under "RISKS TO AQUATIC RESOURCES AND ASSOCIATED RIPARIAN VALUES AND USES":

*"Alternative 1—No Action:* Because of the high level of confusion that will ensue and the long period of time it will take to complete litigation, this alternative would present a high level of risk to aquatic resources and associated riparian values and risks. The scope of this situation will likely expand to other Forests with small mining activities in Riparian Reserves. Administrative emphasis will be on preparation for litigation rather than on-the-ground monitoring.

*Alternative 2—Revise the 36 CFR 228 Regulations to be Consistent with the Standard and Guideline MM–1:* This alternative presents something of a paradox when evaluating its ability to reduce risks to aquatic and riparian resources. On paper, it appears to offer the most rigorous protection. It would recommend changing the regulation to require all mining operations in Riparian Reserves to have Plans of Operation, reclamation bonds, and reclamation plans. And while awaiting that change in the regulations, those plans and bonds would be required for all operations. However, in practice, it would have far lower payoff. The time and personnel required to process and review the required Environmental Assessment for each Plan of Operation with its reclamation bond and reclamation plan is substantial. The Siskiyou National Forest's annual minerals management budget could support no more than a small fraction of the annual small-scale mining Notices of Intention if all had to have Plans of Operations. This would allow far less on-the-ground inspection of mining by minerals administrators. Mining operations without Notices of Intention and without effective oversight by the Agency would become more frequent. Thus, in practice, Alternative 2 could well pose a high degree of risk to aquatic resources and attaining the Aquatic Conservation Strategy objectives.

*Alternative 3—Proposed Action—Revise Standard and Guideline MM–1 through Amendment of the Siskiyou Forest Plan:* This alternative would present a low level risk to aquatic resources and associated riparian values and uses. It will assure that mining operations which are likely to have significant surface disturbance impacts in Riparian Reserves, or those which significantly retard or prevent attainment of Aquatic Conservation Strategy objectives, are analyzed through an appropriate environmental document and approved only through a mining Plan of Operations. Of the alternatives consid-ered, Alternative 3 provides the highest probability of consistent compliance with Aquatic Conservation Strategy objectives. At the same time, it allows the District Ranger to assess, through a variety of tools including the Review Checklist, the unique hydrologic processes, resource values and history associated with each mining proposal in determining whether to require a Plan of Operations. This fosters communications and a good working relationship with smaller miners and the Forest Service management of all mining activity. It means that Forest Service mineral administrators on the forest will spend the bulk of their time working directly with miners on-the-ground rather than processing paper.

\* \* \* \* \* \*

This alternative has the least potential for negative impacts on resources such as wildlife, soils and recreation. It will concentrate the attention of the Forest service minerals administrators on working directly with the small mining community in the field. Recreation provided by small scale placer mining operations in Riparian Reserves should be able to continue pretty much as it has in the past with the proviso that a likelihood of significant surface disturbance will trigger the need for an approved Plan of Operations and related environmental documentation." (AR at 302–304).

The EA contains the following information under "Attainment of Aquatic Conservation Strategy Objectives":

"The attainment of Aquatic Conservation Strategy objectives of the Siskiyou Forest Plan is of paramount concern to managers and specialists on the Siskiyou National Forest. The alternatives proposed here all deal with mining operations in Riparian reserves, and are thus centrally concerned with attaining Aquatic Conservation Strategy objectives.

Attachment A to the April 13, 1994 Record of Decision provides direction on the Aquatic Conservation Strategy. On page B–9 it notes:

The Aquatic Conservation Strategy must strive to maintain and restore ecosystem health *at watershed and landscape scales* to protect habitat for fish and other riparian dependent species and resources and restore currently degraded habitats. (Emphasis added)

On pages B–9 and B–10 it notes:

The important phrases in these standards and guideline are 'meet Aquatic Conservation Strategy objectives', 'does not retard or prevent attainment of Aquatic Conservation Strategy objectives', and 'attain Aquatic Conservation Strategy objectives'. These phrases, coupled with the phrase 'maintain and restore' within each of the Aquatic Conservation Strategy objectives, define the context for agency review and implementation of management activities. Complying with Aquatic Conservation Strategy means that an agency must manage the riparian dependent resources to maintain the existing conditions or implement actions to restore conditions. The baseline from which to assess maintaining or restoring the condition is developed through a watershed analysis. Improvement relates to restoring biological and physical processes within their ranges of natural variability.

The standards and guidelines are designed to focus the review of proposed and certain existing projects to determine compatibility with the Aquatic Conservation Strategy objectives. The intent is to ensure that a decision maker must find that the proposed management activity is consistent with the Aquatic Conservation Strategy objectives. The decision maker will use the results of watershed analysis to support the finding. In order to make the finding that a project or management action meets or does not

prevent attainment of the Aquatic Conservation Strategy objectives, the analysis must include a description of the existing condition, a description of the range of natural variability of the important physical and biological components *of a given watershed,* and how the proposed project or management action *maintains the existing condition or moves it within the range of natural variability.* Management actions that do not maintain the existing condition or lead to improved conditions in the long term would not meet the intent of the Aquatic Conservation Strategy and thus, should not be implemented. (Emphasis added)

All three alternatives have the potential to meet, or not prevent attainment of, the Aquatic Conservation Strategy objectives. The Aquatic Conservation Strategy objectives are objectives for watersheds and landscape, not specific sites. They are, moreover, objectives for given watersheds or landscapes, considering their existing condition and their range of natural variability.

Thus, Aquatic Conservation strategy objectives are one element of decisions made at site-specific and stream-specific level.

*Alternative 1 and 2* The Environmental Assessment conducted for a Plan of Operations would evaluate the attainment of Aquatic Conservation Strategy objectives for all specific mining operation in implementing Alternative 1 and 2.

*Alternative 3* Similarly, this evaluation would be done for all Plans of Operations required under Alternative 3. In implementing Alternative 3, the District Ranger's use of the 'Notice of Intention review Checklist for Mining Suction Dredge Proposals on the Siskiyou National Forest' (see Appendix 1) in evaluating mining proposals submitted on a Notice of Intention. It will serve to identify those operations that are likely to significantly retard or prevent attainment of the Aquatic Conservation Strat-

egy objectives. Where that evaluation shows a minerals operation would retard or prevent attainment of the Aquatic Conservation Strategy objectives, a Plan of Operations, reclamation bond, and reclamation plan will be required. Either site-specific effects or cumulative effects could retard or prevent attainment of the Aquatic Conservation Strategy objectives. In these cases numerous actions, from project design to withdrawal of the stream reach, subject to valid existing rights, could be taken to avoid damage to riparian and aquatic resources. In cases where an operation is not likely to retard or prevent attainment of the Aquatic Conservation Strategy objectives, the Ranger's documentation of no significant surface disturbance will include the operation's effect on achieving Aquatic Conservation Strategy objectives." (AR at 305–307).

In the EA, the Forest Service states that:

"The general permitting procedures of the Oregon Division of Lands and the Army Corps of Engineers are based on a premise that small 'recreational' type mining proposals do not individually or cumulatively have significant impacts on surface resources including aquatic resources when carried out properly." (AR at 329).

In the EA, the Forest Service also states that:

"Mining operations that exist today are scattered, primarily small suction dredging and gold panning activities that process gold placer deposits within streams. Almost all of the current placer mining occurring on the Forest is located in areas that have been continuously mined over the past 100+ years. There still remains a substantial amount of smaller mining activity today. There are approximately 6,000 mining claims on the Siskiyou National Forest. In any given year, the Forest will experience from 150 to 200 active mining operations. The vast majority of these operations are small suction dredge operations that seek gold from in-stream placer deposits. Most of these involve recreational weekend operations in riparian areas with minimal environmental impacts. Most are family endeavors involving two or three people utilizing a dredge 4 inches or less in size." (AR at 199).

█ The EA and the administrative record does not support that the Forest Service took a hard look at the environmental or cumulative impacts that amending Standard and Guideline MM–1 could have on aquatic species and habitat. The EA contains no data or any citations to scientific evidence to support its conclusions. The EA does not contain a reasonably thorough discussion of the probable environmental consequences of amending the regulation. It does not provide an accurate scientific analysis of the potential environmental effects of amending the regulation. It does not provide a convincing statement of reasons why potential effects of amending the regulation to eliminate the requirements of a POO, reclamation bond, and reclamation plan are insignificant. The EA does not provide a statement of reasons showing that the Forest Service took a hard look at the issues raised by plaintiff's and BLM's comments. The EA does not contain any analysis of the cumulative impacts of amending Standard and Guideline MM–1.

In cases such as this, where there is insufficient evidence to determine whether a proposed action will have a potentially significant effect on the environment, remand to the agency to correct the deficiencies in the record is appropriate, rather than ordering the preparation of an EIS. *See National Audubon Society v. Hoffman,* 132 F.3d 7, 18 (2nd Cir.1997).

**Scientific Integrity**

Defendants move for summary judgment arguing that the plaintiff's allegations regarding potential impacts on aquatic resources from mining operations represents a disagreement with the views and methodology adopted by the Forest

Service. In response, plaintiff argues that defendants are not entitled to the degree of deference accorded to agencies for technical determinations, because in this case defendants failed to consider a number of key factors necessary to an informed decision.

Plaintiff moves for summary judgment arguing that: 1) defendants conclusion that amending MM–1 will not cause significant environmental impacts, is not supported by the EA and the accompanying documentation cited by defendants; 2) defendants proceeded to amend the standard and guideline MM–1 without the benefit of sufficient, high quality environmental information on the effects of suction dredging on aquatic species and habitat, the effects of suction dredging or other types of mining on Riparian Reserves, and the impacts of sedimentation on Riparian Reserves; 3) there is no explanation to support the Forest Service's conclusion that revising MM–1 will have insignificant impacts; 4) there is no documentation, other than unsupported conclusions, regarding the impacts of suction dredging; and 5) the Forest Service's analysis of the effects of sedimentation is flawed, because the comparison between sedimentation from suction dredging and sedimentation on the whole national forest does not provide an accurate assessment of the impacts of sedimentation on Riparian reserves. In response, defendants argue that: 1) plaintiff fails to inform the court what information should have been relied upon or what information the defendants ignored or failed to consider; 2) Section V and Section F in the MM–1 EA lists numerous documents that support the EA's findings; 3) plaintiff has not demonstrated the omission of any factor necessary to an informed decision; and 4) plaintiff's disagree with the conclusions reached by the Forest Service, but there is no basis for asserting that the decision was not based on credible scientific information. In reply, plaintiff argues that: 1) the scientific integrity of the EA is undermined by defendants failure to study the environmental consequences of amending Standard and Guideline MM–1; 2)

plaintiff is not challenging the methodology used by the Forest Service, it is challenging the lack of information supporting the Forest Service's finding that the amendment would not cause significant impacts; 3) plaintiff is not required to come forward with information, it need only show that the Forest Service completely failed to address some factor the consideration of which is essential to making an informed decision; 4) the documents relied upon by defendants are either not in the administrative record, are irrelevant, or do not support the Forest Service's finding of no significant impact; 5) the "Harvey Report" contradicts the Forest Service's conclusions; 6) the sedimentation report was not prepared for the purpose of analyzing the impacts of amending MM–1; 7) the sedimentation study is based on a study of logging and forest roads, not suction dredge mining in Riparian Reserves; 8) defendants must document and disclose internal analyses by agency experts; and 9) the Forest Service must disclose the underlying data that the expert relied upon in forming an opinion.

▇▇▇▇ NEPA procedures are designed to ensure that environmental information is made available to public officials and citizens before decisions are made and actions are taken. 40 C.F.R. § 1500.1(a). Agencies are required to "insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements. They shall identify any methodologies used and shall make explicit reference by footnote to the scientific and other sources relied upon for conclusions in the statement." 40 C.F.R. § 1502.24. This regulation requires agencies to provide the public with the underlying environmental data from which an agency expert derives his or her opinion. *Idaho Sporting Congress*, 137 F.3d at 1150.

An EA must "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no signifi-

cant impact." 40 C.F.R. § 1508.9(a). An EA is appropriate "only in those obvious circumstances where no effect on the environment is possible...". *Natural Resources Defense Council v. Duvall*, 777 F.Supp. 1533, 1538 (E.D.Cal.1991). "[T]he conclusion reached must be close to self-evident and would not require an extended document incorporating other studies. Moreover, because the purpose of an EA is to decide whether an EIS must be prepared, ... the document itself (and any attachments or appendices included with it) must facilitate or enable public comment concerning the agency's determination that the project does not significantly affect the environment." *Id.* at 1538–1539 (citations omitted).

■ The court will "defer to an agency's expertise on questions of methodology unless the agency has completely failed to address some factor, consideration of which was essential to a truly informed decision whether or not to prepare an EIS." *Inland Empire Public Lands Council v. Schultz*, 992 F.2d 977, 981 (9th Cir. 1993) (citations and quotations omitted). NEPA does not require the court to decide whether an agency's evaluation is based on the best scientific methodology available or to resolve disagreements among various scientists as to methodology. *Id.* The court is not empowered to decide that the views of the plaintiff's experts have more merit that the agency's experts. *Greenpeace Action*, 14 F.3d at 1333.

The court has previously found that the EA does not provide an accurate scientific analysis of the potential environmental effects of amending the regulation. The court also found that the EA does not provide a convincing statement of reasons why potential effects of amending the regulation to eliminate the requirements of a POO, reclamation bond, and reclamation plan are insignificant. To the extent that plaintiff criticizes the Forest Service's methodology in measuring sedimentation, the court is prohibited from deciding whether an agency's evaluation is based on the best scientific methodology available or

to resolve disagreements among various scientists as to methodology. However, to the extent that plaintiff's argument centers on the lack of information or analysis to support the Forest Service's conclusion, the court may examine whether the Forest Service identified any methodologies used, made explicit reference by footnote to the scientific and other sources relied upon for conclusions in the statement, and whether the agency provided the public with the underlying environmental data from which an agency expert derives his or her opinion. The EA fails to disclose the analyses, methodologies, and data relied upon by Forest Service experts to reach the conclusions in the EA.

■ In this case, the Forest Service has failed to satisfy NEPA's reporting and notice requirements with regard to the effects of sedimentation from suction dredge mining on Riparian Reserves, and what effect, if any, amending MM–1 would have on the sedimentation in Riparian Reserves. The EA and the FONSI do not specifically mention or refer to the report on sedimentation relied upon by defendants. The Forest Service failed to provide the underlying data supporting the conclusions set forth in the report contained in Appendix 5—"A comparison of stream materials moved by mining suction dredge operations to the natural sediment yield rates". The report does not discuss the effects of sedimentation on Riparian Reserves. The EA and the FONSI do not discuss the effects of other types of mining on Riparian Reserves and what effects amending MM–1 would have on other types of mining.

In support of their argument that the Forest Service did not fail to ensure the scientific integrity of the EA, defendants point to Section V Appendices and References which they claim contains numerous documents, which were incorporated by reference, that support the findings in the EA. Defendants also cite to Section F of the EA for "Documents Reference and

Incorporated by Reference" as supportive of the conclusions in the EA.

CEQ regulations permit, under certain conditions, incorporation by reference in an EIS, but there are no provisions allowing such a procedure in an EA. *Duvall,* 777 F.Supp. at 1538. Even if incorporation by reference is allowed in an EA, "[t]he propriety of such incorporation is dependent upon meeting three standards: 1) the material is reasonably available; 2) the statement is understandable without undue cross reference; and 3) the incorporation by reference meets a general standard of reasonableness." *Id.* at 1539 (citations omitted).

Although some of the documents such as various regulations and statutes may be readily available, there is no evidence in the record concerning the public availability of other incorporated materials. *See Id.* In addition, although it appears that the EA is dependent on these documents to support its finding of no significant impact, and the EA does not appear to specifically cite to which documents or portions of these documents support which conclusions. This requires undue cross-referencing. *See Id.* It appears that the incorporation of these materials fails the general reasonableness test. Defendants have failed to point out where these materials are specifically cited to in the materials to support their conclusions. *See Id.* Since, the incorporation by reference of these materials fails, justification for the Forest Service's conclusion of no significant impact must be found within the EA itself. *Id.*

There is insufficient information in the EA to support the Forest Service's conclusion that amending MM–1 will have an insignificant effect of the environment. Even if these documents were properly incorporated by reference into the EA, the documents are not part of the administrative record which was transmitted to the court, and the court cannot determine whether the conclusions in the EA are supported by these documents. The "Harvey Report" which is part of the adminis-

trative record, and to which defendants point to support the conclusions in the EA, does not appear to support the Forest Service's conclusion of insignificant impacts from amending the regulation.

This report points out that suction dredging can negatively affect aquatic resources, can greatly alter stream channels, and mobilize fine sediments. It states that effects of individual suction dredge operations tend to be localized and short-term, but that off-site and long term effects are not apparent and are poorly understood. The report states that a single operation would not seriously threaten or conflict with resources in a river system, but conflicts arise from numerous dredging operations interacting with other beneficial uses at the scale of a river system. (Plaintiff's Exhibit A at 3).

The report acknowledges that other than generalizations, "not much is known about the effects of suction dredging on rivers and associated ecosystems." It states that "[e]ffects of suction dredging are difficult to evaluate or predict because of the inherent complexity of biologic and geomorphic processes interacting in stream channels. Cumulative effects, in particular, are difficult to predict or evaluate." (Id.).

As discussed earlier, an agency must adequately explain its decision not to prepare an EIS by supplying a convincing statement of reasons why potential effects are insignificant. *Oregon Natural Desert Association,* 47 F.Supp.2d 1182, 1193 (D.Or.) (quoting *Steamboaters v. F.E.R.C.,* 759 F.2d 1382, 1393 (9th Cir.1985)). The statement of reasons is crucial to determining whether the agency took a hard look at the potential environmental impacts of the project. *Id.* "An agency must set forth a reasoned explanation for its decision and cannot simply assert that its decision will have an insignificant effect on the environment." *Marble Mountain Audubon Soc. v. Rice,* 914 F.2d 179, 182 (9th Cir.1990) (citation omitted). Conclusions that are reached without any study or

supporting documentation are insufficient to satisfy an agency's NEPA obligations. *Id.*

In the FONSI, the Forest Service found that, "based on the effects analysis in the EA and in light of other factors listed in 40 CFR 1508.27", the proposed action would not significantly affect the quality of the human environment. (AR at 329). The Forest Service found that: "Past monitoring, hydrological dynamics, and practical experience across the Siskiyou National Forest lead us to expect no measurable off-site environmental effects or serious on-site environmental effect." (Id.). The Forest Service acknowledged that there was controversy over "the desirability of small-scale mining in riparian areas", but found that "scientific and professional experience indicate that small-scale mining can occur without significant environmental effects."

In support of this conclusion, the Forest Service cites to the Oregon Division of State Lands statement that "most recreational placer mining operations do not merit the full permit process required by Removal–Fill Law because they pose only minimal individual or cumulative environmental impact if performed properly." (AR at 330). The Forest Service also cites the "Biological Assessment Final FY 96 Projects for Medford District, Bureau of Land Management; Rogue River and Siskiyou National Forests, 29 February 1996." [5] The Forest Service found that this document "evaluated mining operations through the year 2005 and has determined that most mining activities across the Siskiyou National Forest is (sic) relatively minor and has (sic) no effect on listed species." (Id.). The Forest Service found that "[b]ecause this decision establishes a process for evaluating site-specific effects of subsequent actions, it in itself has no significant effects on the physical, biological, or social aspects of the human environment." (Id.).

The court finds that the Forest Service's conclusions in the EA and FONSI are not

supported by study or supporting documentation, and are insufficient to satisfy the agency's NEPA obligations. There is insufficient evidence to determine whether the proposed action will have a potentially significant effect on the environment, and, therefore, remand to the agency to correct the deficiencies in the record is appropriate, rather than ordering the preparation of an EIS. *See National Audubon Society,* 132 F.3d at 18.

**Range of Alternatives**

Defendants move for summary judgment on plaintiff's NEPA claim arguing that the EA fully comports with NEPA as to the alternatives discussed. In response, plaintiff argues that: defendants' range of alternatives was inadequate, because all the alternatives were narrowly tailored to weaken regulatory oversight of mining operations in Riparian Reserves and none of the alternatives would have reduced mining in Riparian Reserves; and defendants should have considered an alternative to withdraw all or part of Riparian Reserves from mineral entry. In reply, defendants argue that plaintiff ignores the purpose of the EA, which was to amend MM–1 to conform with the mining regulations

NEPA requires an agency to consider a reasonable range of alternatives to the proposed action. *City of Carmel-by-the Sea v. U.S. Department of Transportation,* 123 F.3d 1142, 1155 (9th Cir.1997); *See Prairie Wood Products v. Glickman,* 971 F.Supp. 457, 471 (D.Oregon 1997). The range of alternatives is determined by the statement of the purpose and need of the project, "which briefly defines 'the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action.'" *City of Carmel–by–the–Sea,* 123 F.3d at 1155. "The stated goal of a project necessarily dictates the range of 'reasonable' alternatives and an agency cannot define its objectives in unreasonably narrow terms." *City of Carmel–by–the–Sea,* 123

---

5. This document is not part of the administrative record transmitted to the court.

F.3d at 1155. The court must determine whether the final "Purpose and Need" was reasonable, and then whether the alternatives considered were reasonable in light of the cited goals. *Id.*

The "PURPOSE AND NEED" section of the Revised EA provides:

"The purpose of the Proposed Action is to clarify management direction on the Siskiyou National Forest for mining operations in Riparian Reserves. Specifically, its purpose is to clarify the direction given in 36 CFR 228.4(a) and the apparent incongruity in the direction given in Forest Plan standard and guideline MM–1 . . . .

The underlying needs of the Proposed Action include the need to effectively manage mining on the Siskiyou National Forest. To be effective, this management will attempt to minimize damage to the extent possible to the surface resources (including aquatic resources) from significant disturbance from mining and related activities. In addition, this management needs to not deny the orderly exploration and production of minerals consistent with the General Mining Law of 1872 and Forest Service regulation and policy.

To be efficient, the management of a resource program on a National Forest uses funds and personnel commensurate with the potential risk of different activities to the environment. The Siskiyou National Forest is allocated a finite budget for trained minerals personnel and for minerals management activities. To be most effective, these people and funds need to be focused on those mining activities that pose the most risk to surface and aquatic resources. It is also crucial that they work to assure that low-risk operations operate so that they avoid significant environmental disturbance. It would not be efficient or effective if they were to focus almost their attention on a few, low-risk, mining operations while giving little or no attention to many others." (AR at 291–292).

■■ It is not inappropriate for an agency to change the "Purpose and Need" section of a final environmental document to "more clearly articulate" the purpose and need of the project. *City of Carmel-by-the-Sea*, 123 F.3d at 1156. This appears to be what took place in this case. The purpose to clarify the direction given in 36 C.F.R. § 228.4(a) and the apparent incongruity in the direction given in Forest Plan standard and guideline MM–1 was derived from one of the purposes listed in the first EA. The conflict between 36 C.F.R. § 228.4(a) and Standard and Guideline MM–1 and litigation that ensued based on the inconsistency between these management directions was the motivation for the proposed action, and this problem was the main focus of the first EA. (AR at 201–202). The court finds that this clarification and narrowing of the purpose was not unreasonable given the focus of both Environmental Assessments. *See City of Carmel-by-the-Sea v. U.S. Department of Transportation*, 123 F.3d 1142, 1156–1157 (9th Cir.1997).

Both Environmental Assessments considered the following alternatives: Alternative 1—no action—neither MM–1 or 36 C.F.R. § 228.4(a) would be modified; Alternative 2—modification of 36 C.F.R. § 228.4(a) to be consistent with Standard and Guideline MM–1; and Alternative 3—modification of Standard and Guideline MM–1 to be consistent with 36 C.F.R. § 228.4(a). The alternative of removing all Riparian Reserves from mineral entry was rejected, because it did not meet the purpose of allowing continued mineral exploration. The alternative of withdrawing selected portions of Riparian Reserves from mineral entry was rejected, because the Forest Service stated that it did not "respond to the need to clarify management direction and provide congruent and effective approach to reconcile direction." (AR at 300).

■■ An agency does not have to consider alternatives which are lacking feasibility, ineffective, or inconsistent with the

basic policy objectives for the management area. *Prairie Wood,* 971 F.Supp. at 471. "The range of alternatives that must be considered need not extend beyond those reasonably related to the purposes of the project." *Surfrider Foundation v. Dalton,* 989 F.Supp. 1309, 1327 (S.D.Cal.1998). It is improper for the court to broaden the purpose and need of a project. *See City of Angoon v. Hodel,* 803 F.2d 1016, 1021 (9th Cir.1986), *cert. denied,* 484 U.S. 870, 108 S.Ct. 197, 98 L.Ed.2d 148 (1987).

■ It appears that defendants range of alternatives was reasonable given the purpose and need of the EA. The focus of the EA was to provide congruity between Standard and Guideline MM–1 and 36 C.F.R. § 228.4(a). Plaintiff's proposal to eliminate certain portions of Riparian Reserves from mineral entry would broaden the focus of the EA to resolve the differing management directions contained in 36 C.F.R. § 228.4(a) and the Standards and Guidelines governing other management areas of the National Forest which have different management directions than those contained in 36 C.F.R. § 228.4(a). These other management areas and their governing standards and guidelines were not addressed in the EA. The focus of the EA was limited to resolving the conflict between Standard and Guideline MM–1 and 36 C.F.R. § 228.4(a). The court finds that defendants definition of the proposals purpose and need and the range of alternatives did not violate NEPA.

**Adequacy of Mitigation Measures**

■ In count six of its complaint, plaintiff alleges that the EA violates NEPA, because it does not contain any provisions for monitoring suction dredge mining activity to assure that no significant impacts are occurring and the Aquatic Conservation strategy is being complied with. Defendants move for summary judgment on this claim arguing that plaintiff's assertions regarding the inadequacy of the EA as to mitigation measures are without merit. Plaintiff has not responded to this argument.

A "mitigated FONSI is upheld when the mitigation measures significantly compensate for a proposed action's adverse environmental impacts." *Oregon Natural Desert Association,* 47 F.Supp.2d 1182, 1193 (D.Or.). "[A]lthough mitigation measures need not completely compensate for adverse environmental impacts, ... the agency must analyze mitigation measures in detail and explain how effective the measures would be." *Id.* (citations omitted). Merely listing mitigation measures is insufficient. *Id.* (Citation omitted). Mitigation measures must be supported by analytical data. *Id.*

The EA contains the following information on mitigation measures:

"1. MITIGATION MEASURES COMMON TO ALL ALTERNATIVES: The Forest Service will continue to require at least a mining Notice of Intention from anyone proposing to carry out mining activities within Riparian Reserves. All responses to a Notice of Intention shall be in writing; no verbal Notices of Intention will be accepted. Applicable State and other federal permits must be obtained by the miner before mining operations begin. (The Forest Service is not responsible for enforcing the actual acquisition of such permits.) The Forest Service will monitor mining activities to the extent of its fiscal and personnel resources. Where noncompliance is discovered during monitoring activities, the miner would be informed of the need to acquire such permits and the appropriate State or federal authorities shall be notified. The study 'Effects of Suction Dredging on Streams: A Review and Evaluation Strategy' (Harvey, et al., 1995) shall be considered when making decisions related to suction dredging proposals on the Forest. Any mining Plans of Operation approved by the Forest will contain a mitigation measure that requires compliance with all laws and regulations of State and federal agencies during mining operations." (AR at 295).

The EA's mitigation measures do not satisfy the requirements of NEPA. The EA does not analyze mitigation measures in detail and explain how effective these measures would be, and the mitigation measures are not supported by any analytical data.

**Necessity of EA for Multiple Mining Operations on Silver Creek**

Plaintiff argues that defendants violated NEPA when they failed to prepare an EA to assess the environmental and/or the cumulative impacts from multiple mining operations on Silver Creek. In response, defendants argue that plaintiff's allegations regarding the need for an EA for mining operations in 1998 on Silver Creek are moot, and, even if this claim were not moot, plaintiff ignores that federal agencies have the authority to make the threshold determination of whether a federal action is one that would significantly affect the environment. In reply, plaintiff argues that plaintiff's claims regarding the 1998 suction dredge season are not moot and suction dredging may cause significant impacts to Silver Creek that must be analyzed in an EA.

 The court finds that plaintiff's claim falls within the exception of an action which is capable of repetition yet evading review: the mining season is of a short duration, four months long, and it is reasonably likely that defendants will allow mining operations to continue on Silver Creek without applying any NEPA requirements. Therefore, this claim is not moot. *See Oregon Environmental Council v. Kunzman,* 714 F.2d 901, 903 (9th Cir.1983).

 When addressing the threshold question of NEPA applicability, the court applies the less deferential reasonableness standard to an agency's determination that certain activities are not subject to NEPA's procedures. *Northcoast Environmental Center v. Glickman,* 136 F.3d 660, 667 (9th Cir.1998). NEPA compliance is only required for "major federal actions significantly affecting the quality of the human environment." *Sierra Club v. Pen-*

*fold,* 857 F.2d 1307, 1313 (9th Cir.1988) (citations omitted). The regulation of private mining operations by a federal agency is considered a "federal action". *See Id.* The "significantly affects" requirement is met "if the proposed project may significantly degrade some human environmental factor." *Id.* at 1313–1314 (citation omitted).

"An agency must prepare an EIS if substantial questions are raised as to whether a project . . . may cause a significant degradation of some human environmental factor. The plaintiff need not show that significant effects will in fact occur, but if the plaintiff raises substantial questions whether a project may have a significant effect, an EIS must be prepared." *Greenpeace Action,* 14 F.3d at 1332 (citations and quotations omitted).

Plaintiff's have presented evidence that: during the 1998 mining season, the Forest Service received notices of intent from five miners to operate on Silver Creek; three of the projects involved the use of five or six inch suction dredges to move 40–50 cubic yards of streambed material at eight different claims; the remaining notices of intent involved prospecting with hands tools and panning; all the operations were located on a stretch of Silver Creek from just below the North Fork to Silver Falls, within a SRA; Silver Creek is a pristine watershed and one of the last strongholds for wild fish; Silver Creek has exceptional water quality and cool water temperatures; according to the Harvey report, suction dredging causes sedimentation when the streambed is disturbed and when tailings are discharged; the vicinity of the suction dredge operations in Silver Creek are in a "critical reach" and is sensitive to sedimentation; sedimentation can be lethal to aquatic species; fish are attracted to sediment and tailings when nesting; these tailings are unstable and eggs may suffocate when stream flows destroy the nest; sediment can choke eggs and alevins; steelhead in Silver Creek spawned late in 1997 and overlapped with the start of the suc-

tion dredge season; amphibian eggs are susceptible to harm from sedimentation; if stream materials are moved during dredging, older fish may suffer adverse impacts; Silver Creek is noted for its complex and diverse habitat and the proliferation of fish-bearing pockets and pools; Silver Creek's excellent water quality is at risk from sedimentation, dredging fuel, and sewage; the Harvey report suggests the need for the evaluation of suction dredging effects on individual watersheds; and the Harvey report also warns of potential cumulative impacts from multiple suction dredge operations.

 It appears that the Forest Service's review and regulation of individual Notices of Intent to mine is considered only "marginal federal action rather than a major action", and, therefore, NEPA's requirements are not triggered *See Id.* at 1314. However, plaintiff has raised substantial questions whether multiple mining operations on Silver Creek may have a significant effect. In such circumstances, an EA is warranted to determine whether these multiple mining operations will have a significant effect on the human environment.

## IV. RECOMMENDATION

Based on the foregoing, it is recommended that defendants' motion for summary judgment (# 22) be granted in part and denied in part and plaintiff's motion for partial summary judgment (# 25) be granted in part and denied in part.

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment or appealable order. The parties shall have ten days from the date of service of a copy of this recommendation within which to file specific written objections with the Court. Thereafter, the parties have ten days within which to file a response to the objections. Failure to timely file objections to any factual deter-

minations of the Magistrate Judge will be considered a waiver of a party's right to de novo consideration of the factual issues and will constitute a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the Magistrate Judge's recommendation.